**REDMOND et al. v. COMMERCE TRUST CO.**

No. 12746.

Circuit Court of Appeals, Eighth Circuit.

July 24, 1944.

Writ of Certiorari Denied Nov. 20, 1944.

See 65 S.Ct. 187.

Fyke Farmer, of Nashville, Tenn., and Rudolph K. Schurr, of St. Louis, Mo., for appellants.

Paul Barnett, of St. Louis, Mo. (James E. Goodrich and Watson, Groner, Barnett & Whittaker, all of Kansas City, Mo., on the brief), for appellee.

Before STONE, THOMAS, and JOHN-SEN, Circuit Judges.

STONE, Circuit Judge.

An amended petition alleges a class action in equity by two holders of "Series 'L' Collateral Trust Investment Certificates" issued by United Securities Company of Missouri (name later changed to United Funds Management Corporation) under a trust indenture, against the trustee. From a dismissal, on motion, of the petition, plaintiffs appeal.

In the order of dismissal, the Court stated the reasons therefor as follows: "This is not a class action. The interests of the present plaintiffs conflict with the interests of those they seek to represent in many particulars, the amount in dispute between these plaintiffs is not sufficient to confer jurisdiction and in addition thereto the bill should be dismissed on the merits."

Appellants state that "The sole question involved in this appeal is whether or not the lower Court had jurisdiction." The parties argue the matters of class action [1] and of jurisdiction of the bankruptcy court. Appellee seeks further to sustain the order on the ground that no cause of action is stated. Hence, the matters for determination here are two jurisdictional issues—class action and jurisdiction of the bankruptcy court—and, if there be jurisdiction in the trial court, the sufficiency of the petition as stating a cause of action.

### Class Action Issue.

Appellants assert that, "in its essential character, this is a suit to enforce and administer a trust" wherein plaintiffs are interested as beneficiaries with a large num-

---

[1] While there is argument concerning "jurisdictional amount," this may be passed over since appellants concede that the aggregated amounts of their two claims is less than the necessary jurisdictional amount. Unless this is a class action, the jurisdictional amount is not present. Therefore, this issue is whether or not this is a class action.

ber of other beneficiaries, in the preservation of a trust fund and its proper distribution among the beneficiaries. Appellee contends (1) that the interests of plaintiffs are several and not joint for the purpose of enforcing one indivisible right or title which will result in a single decree; and (2) that plaintiffs do not represent other beneficiaries because the interests of plaintiffs are hostile to those of other beneficiaries. To determine these issues, we must, in so far as necessary, analyze the amended petition to ascertain the grounds stated for and the relief sought.

The petition is filed on behalf of plaintiffs (holders of Series "L" Collateral Trust Investment Certificates) "and all other owners and holders of Series 'L' Certificates who are entitled to the benefit of the security for their contracts or certificates under and by virtue of the provisions of the certificates and said Collateral Trust Indenture." Copies of the certificates of plaintiffs and of the trust indenture are annexed to and, by reference, made parts of the petition.

The plan set forth in the certificates and in the trust indenture and as alleged in this petition was, concisely, as follows: Certificates were issued in "series" of which six (Series A, F, G, H, K and L) were outstanding. Each series was secured by a separate trust indenture—Commerce Trust Company being trustee in Series A, F, H and L. The certificates called for stated values due on maturity in ten or fifteen years from issue. The purchasers made payment in full (called Prepaid Investment Certificates) or made initial and periodical instalment payments up to maturity (called Installment Investment Certificates).

While the prime liability of the Company was to pay only on and at maturity, there were three "optional settlements" accorded to certificate holders *upon maturity* of their certificates—one covered interest if the money be left with the Company, the second covered leaving the money with the Company and continuation of instalment payments, and the third covered periodical (monthly, quarterly or semi-annually) payments of the matured value with interest. Also, provisions were stated whereunder certificate holders could withdraw or the Company could call in certificates *before maturity* thereof. If the Company exercised its right to call in certificates before maturity, its obligation was to pay the "full amount paid" in with interest at 4½% [2] compounded annually for the time the Company had the use of such money.[3] If the certificate holder withdrew before maturity he received the "surrender value" of his certificate as set forth in a table of surrender values.[4] The certificates state that "The true measure of the Company's liability under this and like Certificates, shall at all times be the optional settlement or cash surrender values as shown in Paragraph 12 hereof,[4] less the amount of any loans made thereon." Other like statements are in the certificates and in the trust indenture. The indenture states also that "For the purpose of this Agreement the Company's liability on all Installment Investment Certificates until maturity thereof shall be deemed to be the cash surrender values before maturity set forth in the Certificates, less the amount of any loans thereon. On all Installment Investment Certificates 'Series L' it is further expressly agreed and understood that the Company shall have no liability as to the deposit of securities with the Trustee until the certificates have a cash surrender value, and the Company's further liability as to the deposit of securities with the Trustee shall be governed entirely by the cash surrender value or values as said val-

---

[2] The certificates attached to this petition state the interest rate as 4½% while the trust indenture states 5%. This difference has no relevancy to the matters before us.

[3] This provision in the certificates is slightly different from that in the trust indenture but such differences are not important as to the matters before us. The certificates state: "The Company shall have the right at any time at its option, to call in this Certificate and take it up by paying the record owner hereof the full amount paid hereon, together with interest at 4½% per annum compounded annually, for the time the Company has had the use of the money, less any indebtedness due the Company, and shall have a like right to call in and pay off any Certificate issued in lieu hereof, or any of the optional settlements herein, by paying the then present worth computed on the basis of 4½% compounded annually, less the amount of any loans made thereon."

[4] The table of surrender values, per $1,000 maturity value, is as follows:

| 18 mo. | 2 yrs. | 3 yrs. | 4 yrs. | 5 yrs. | 6 yrs. | 7 yrs. | 8 yrs. | 9 yrs. | 10 yrs. |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|---------|
| "$49 | $92 | $179 | $272 | $395 | $480 | $600 | $727 | $862 | $1,000." |

ue accrues." Another statement in the indenture was: "The Certificates issued under this Agreement, known as 'Series L', shall be secured by the trust fund, irrespective of the actual date of their issuance and negotiation, and the trust fund shall be for the equal benefit of each and every Certificate outstanding under this Agreement, proportionately to the cash surrender values thereof, irrespective of the date of the assignment to and deposit with the Trustee of the securities constituting the same." Another is: "If at any time there shall occur on the part of the Company any event of default or failure in this article specified and herein termed 'events of default', as follows, namely: * * * (c) The Company shall make an assignment for the benefit of creditors, or a receiver shall be appointed for the Company, or of its property or of any substantial part thereof, or a petition in bankruptcy be filed by or against the Company unless the order for the appointment of a receiver of the Company or of its property be vacated or such petition in bankruptcy be dismissed within sixty (60) days from the making or filing thereof, respectively. Then, when, and as often as any of such events of default shall occur, the Trustee shall be governed and controlled by the provisions of Article Five [5] in this Agreement."

This petition alleges that the Company was adjudicated a bankrupt (October 1, 1942) on voluntary petition; that the assets of the Company (together with the collateral deposited in the various trusts), when the bankruptcy petition was filed, were worth "far in excess of the aggregate stated cash surrender value of the contracts then outstanding"; that the aggregate of amounts paid in by Series L certificate holders was at least several hundred thousand dollars in excess of the aggregate surrender value of such certificates; that, if the Company had called in all of its outstanding certificates, the worth of its assets and of the collateral deposited under the various trust indentures would have been insufficient to pay such; that, if all certificate holders receive only surrender value, there will be a surplus from the collateral under the various indentures of approximately $250,000; and that this surplus together with other assets will be sufficient to pay all claims not under the indentures and leave a residue of between $350,000 and $500,000 for the Company.

---

[5] Article Five, referred to, is as follows:

"Section 1. In every case of the occurrence of any event in default specified in Article Four of this Agreement, the Trustee, in its discretion, may, and upon request in writing signed by the holders of a majority in amount of the cash value of the Company's Certificates, 'Series L,' at the time outstanding, and upon proper indemnification for the costs, expenses and damages to be incurred by it, the Trustee shall proceed to protect the rights of the holders of the Company's Certificates under this Agreement by such suit or suits in equity or at law as it shall deem advisable, for the specific performance of any covenants or agreements herein contained, or in aid of the execution of any power herein granted, or it may proceed to realize, as far as possible, by the collection, through legal action or otherwise, of the securities which shall then constitute the trust fund to secure the Certificates issued under and secured hereby, and apply the proceeds so collected to the payment of the amount then due upon the Company's Certificates, in the manner provided for in Section 2 of this Article, and the action of the Trustee shall be binding on all holders of said Certificates.

"Section 2. It is understood and agreed that the proceeds of any collections of any securities constituting the trust fund, together with any and all other sums which, according to the provisions of this Agreement shall belong to the trust fund, shall be applied as follows:

"First: To the payment of the reasonable compensation, costs and expenses of all kinds of the Trustee in the administration of the trust, including counsel fees;

"Second: To the payment of the cash surrender value as shown then to be due on each and all of the Company's Certificates hereby secured, then issued and outstanding, until the aggregate amount of the then cash surrender value of all of said Certificates is paid and in case there be not sufficient to pay the whole thereof in full, then to apply the same pro rata upon all such Certificates;

"Third: Any surplus to the Company, its successors or assigns, or to whomever shall be entitled to receive the same.

"Section 3. Any property or securities constituting part of the trust fund which after the payment in full of the Company's Certificates (according to Section 2 of Article Five hereof) and the costs and expenses due and payable under any of the provisions of this Agreement shall remain in the hands of the Trustee, shall be assigned to and delivered by the Trustee to the Company, its successors or assigns, or to whomever may be lawfully entitled to receive the same."

This petition further alleges courses of conduct by the Company and by the Trustee which, it is claimed, entitle plaintiffs to proceed in a class action and to have the other reliefs prayed. These courses of conduct are as follows. In July, 1942, the Company sent a circular letter "To Holders of 'Guaranteed' Certificates, Ten and Fifteen-year Contracts" wherein it was stated that the Company was having difficulty in finding investments which would yield sufficient to mature the certificates; that "the sufficiency of the company's reserves to mature all such certificates has been questioned"; but that it could "meet all current requirements for surrender values on request." In September, 1942, a petition was filed against the Company and certain of its officers by the Securities and Exchange Commission in the United States District Court for the Western District of Missouri. This petition alleged that up to the sixth or eighth year of instalment certificates (dependent on maturity in ten or in fifteen years), the cash surrender values were considerably less than amounts paid in by certificate holders; that the Company's obligations on the certificates become progressively heavier with the age of the certificates; that (as of December 31, 1941) the reserves to meet maturities were not sufficient to meet maturities of all outstanding certificates; that the Company had "commenced inducing" certificate holders to surrender their certificates in order to obtain for its stockholders the "large profit" between the surrender values and the amounts paid in; that between the date of the above letter and August 28, 1942, certificates for approximately 10% of the total surrender values had been surrendered, resulting in substantial losses to the holders and gains to the Company; that continued surrenders would have like results; that this procedure by the Company was a plan of liquidation which would have like unfavorable results; that the Company had not marshalled its assets in an effort to make a fair distribution thereof to certificate holders; and that the Company had adopted this practice for the purpose of unfairly enriching its stockholders at the expense of the certificate holders. The reliefs sought were an injunction, removal of the Company officers and directors, and the appointment of a receiver.

On or about the date for answering the petition of the Commission, the Company had filed a voluntary petition in bankruptcy and, on October 1, 1942, was so adjudicated and a trustee appointed. The bankruptcy petition and list of creditors was impounded by order so that these plaintiffs are unable to state the reasons given for filing such petition. However, upon certain stated information, they allege that, at the time such petition was filed, the Company assets together with collateral deposited under the different trusts were far in excess of the then aggregate surrender value of all outstanding certificates and that there was an excess of several hundred thousand dollars of aggregate payments on Series L certificates over the then aggregate surrender value of such certificates.

Shortly after filing the petition in bankruptcy, the Company filed an answer to the above petition of the Commission. Therein it stated that the petition in bankruptcy had been filed; that, prior to the Commission proceeding, it had submitted to the Commission a proposed plan of liquidation which provided for retention of $350,000 cash by the Company ("representing presumably, the value of the stock" on the basis of liability on certificates only for cash surrender values) and the transfer of remaining assets to a new corporation which would continue to receive payments from outstanding certificate holders; and that this proposed plan was not approved. Also, the trustee in bankruptcy filed an answer setting up the bankruptcy proceeding and his appointment as trustee. This action by the Commission was, in January, 1943, ordered continued subject to call for hearing on ten days notice.

About December 16, 1942, this appellee Commerce (as trustee under this indenture) had applied to the bankruptcy court for leave to sue the trustee in bankruptcy of the Company and the Company to test its power, as trustee, to sell the trust securities and to obtain a construction of the trust indenture as to the proper date for determining surrender values of certificates. About December 21, 1942, the trustee in bankruptcy filed answer and a motion denying any necessity for such construction of the trust indenture; asserting that the liquidation of the collateral held in trust should be under the jurisdiction of the bankruptcy court; and seeking an order making the Commerce, as trustee, a party to the bankruptcy proceedings. January 6, 1943, the Commerce answered this motion, alleging its exclusive possession

and title to the trust fund collateral adverse to the trustee in bankruptcy; that there was no jurisdiction to make it a party to the bankruptcy proceedings; and that the bankruptcy court had jurisdiction only to determine whether its claim of possession and title was in good faith or only colorable.

On February 25, 1943, Commerce entered a written agreement with the trustee in bankruptcy and the bankrupt Company. This agreement was entitled:

"In the District Court of the United States for the Western District of Missouri, Western Division.

"In the Matter of

United Funds Management Corporation, a corporation,

"No. 17,505

"In Bankruptcy.

"Stipulation in Settlement of Controversies Arising on Application for Leave to Sue the Trustee in Bankruptcy and the

Bankrupt filed by Commerce Trust Company, and Trustee in Bankruptcy's Application for Petition to Have Summons Issued and Directed to Commerce Trust Company, Trustee."

It provided that it should not be valid until approved by the Court "by an order entered in the above entitled cause." The Court seems to have treated the contract as a "stipulation" and approved it the same day. The contract covered only the trust funds under "Series L" certificates. The rights, duties and obligations of the parties under the contract are set forth in the footnote 6.[6]

Thereafter, Commerce filed a suit in the State court (as allowed in the contract) against twenty-five holders of Series L certificates—all being residents of Missouri. Inter alia, this action sought declarations that Commerce had power to sell the securities in the trust fund and that the word "then" in the phrase of the trust indenture

---

[6] "2. Commerce will furnish to the Trustee in Bankruptcy a list and a description of all of the assets in its possession or under its control as trustee under the above described indenture.

"3. The Trustee in Bankruptcy will furnish to Commerce the names and addresses of all holders of Series 'L' certificates issued pursuant to the provisions of said Trust indenture, so far as known to the Trustee in Bankruptcy, together with the date, amount and description of the certificate or certificates held by each of them which were outstanding and in force on the 1st day of October, 1942, which is the date of the adjudication of bankruptcy in the above entitled cause.

"4. The parties to this contract agree as between themselves that said trust indenture, by necessary implication,, confers on Commerce the power to sell all assets in said trust estate (other than cash) at private sale or sales, or at public auction or auctions, and that the words 'then to be due', and the word 'then' above mentioned, refer to the date of the above mentioned adjudication of bankruptcy, namely, October 1, 1942.

"5. There are approximately 5,000 Series 'L' certificates which were outstanding and in force on October 1, 1942, and a great many of the holders thereof have filed no claims arising under said certificates against the Bankrupt in the bankruptcy court, and Commerce fears and believes that not all of said certificate holders will file claims in the bankruptcy court and that not all of them will subject themselves to the jurisdiction of the bankruptcy court

for the purpose of determining the powers of Commerce, as Trustee, and the meaning of the words 'then to be due' and the word 'then', as used in the above quoted language in the trust indenture.

"Therefore, as a protection against claims of certificate holders being made after Commerce has exercised its powers as trustee in whole or in part, Commerce, as trustee under said indenture, may bring a class suit in the Circuit Court of Jackson County, Missouri, for the purpose of procuring, as against all the Series 'L' certificate holders, a judicial determination as to whether it has the power of sale or sales, both private sale or at public auction, or both, as to all of the assets in said trust estate (other than cash) and the Trustee in Bankruptcy and the Bankrupt may intervene in such suit as parties hereto.

"6. Commerce will do none of the following things without first obtaining the approval of the bankruptcy court:

"(a) Sell any asset or assets in the trust fund;

"(b) Determine the surrender value of any Series 'L' certificate for the purpose of liquidation and distribution as provided by the trust indenture;

"(c) Fix the date or amount or make payment of any distribution or partial distribution of cash to certificate holders pursuant to the provisions of the trust indenture;

"(d) Pay any attorney's fees for legal services rendered in connection with the administration of the trust estate.

"(e) Apply any of the assets of the trust

reading "then to be due" [7] be construed to refer to October 1, 1942, the date of the bankruptcy adjudication of the Company. Certain of these defendants filed answer and cross-bill, in which they asserted that the holders of outstanding Series L certificates had an equitable lien upon the collateral held by Commerce, as trustee, and were entitled to have such applied in payment of the value of their contracts. Commerce answered this cross-bill, averring, inter alia, that the State court had no jurisdiction to enforce an equitable lien as prayed because of the above contract with the trustee in bankruptcy not to make any distributions from the trust fund without the approval of the bankruptcy court; that the bankruptcy court had acquired prior, exclusive jurisdiction to enforce the contract and to supervise the distributions from the trust fund to all holders of Series L certificates; that the bankruptcy court had prior and exclusive jurisdiction to determine any preference, priority or lien, over and above surrender values of the certificates, upon the trust funds because any surplus over the trustee's expenses and such surrender values would be payable to the trustee in bankruptcy and if the assets of the bankrupt estate (including any surplus from the trust fund) should exceed all indebtedness and costs such balance would be payable to the bankrupt; that the trust indenture created a lien for the certificates only to the extent of the surrender values and, therefore, there could be no equitable lien on the trust fund for the certificate holders; and that the claims of certificate holders, beyond surrender values, were "only the claims of unsecured lenders of

---

estate to the compensation of Commerce for its services as trustee under the trust indenture.

"7. It is agreed that Commerce is entitled to reasonable compensation for all of its services reasonably necessary to the performance of all of its duties as trustee under the trust indenture and reasonably necessary to its protection from liability in the performance of all of such duties; that it is entitled to reimburse itself for all expenses incurred which are reasonably necessary to the performance of all of its said duties as such trustee, including attorney's fees for legal services reasonably necessary to the performance of all of such duties, and that all of such compensation and expenses constitute reasonable charges against the trust estate in the possession of such trustee, all subject to the approval of the Court.

"8. Subject to the limitations herein, Commerce shall liquidate, collect the securities, and administer and disburse the proceeds of the trust estate in the manner directed by the trust indenture, and will, with reasonable diligence, strive for a prompt, expeditious and judicious liquidation of the trust fund and the distribution thereof pursuant to the terms of the trust indenture.

"9. None of the parties hereto hereby waive any right that any of them might have to appeal from any order made by the bankruptcy court provided for herein, but they do agree to voluntarily submit themselves to the jurisdiction of the bankruptcy court to make the orders contemplated by and provided for by this agreement. They only reserve the right by appeal to urge that error was committed in the making of any such order.

"10. Whenever ordered by the bankruptcy court, Commerce will furnish to the Trustee in Bankruptcy a statement of the assets in the trust fund that have been converted into cash, the expenses that have been incurred and the amount of cash in the hands of Commerce, as trustee under such indenture."

[7] The quoted expression is in Article Five of the indenture dealing with the powers and duties of the trustee on default of the Company. In section 2 of that Article appears the following: "Section 2. It is understood and agreed that the proceeds of any collections of any securities constituting the trust fund, together with any and all other sums which, according to the provisions of this Agreement shall belong to the trust fund, shall be applied as follows: * * * Second: To the payment of the cash surrender value as shown *then to be due* on each and all of the Company's Certificates hereby secured, then issued and outstanding, until the aggregate amount of the then cash surrender value of all of said Certificates is paid and in case there be not sufficient to pay the whole thereof in full, then to apply the same pro rata upon all such Certificates;

"Third: Any surplus to the Company, its successors or assigns, or to whomever shall be entitled to receive the same.

"Section 3. Any property or securities constituting part of the trust fund which after the payment in full of the Company's Certificates (according to Section 2 of Article Five hereof) and the costs and expenses due and payable under any of the provisions of this Agreement shall remain in the hands of the Trustee, shall be assigned to and delivered by the Trustee to the Company, its successors or assigns, or to whomever may be lawfully entitled to receive the same." (Italics added.)

money and of common creditors." On hearing, a decree was entered by the State court declaring that Commerce had power to sell the collateral in the trust fund; that the word "then" referred to September 29, 1942, the date the bankruptcy petition was filed; and that the cross-bill be dismissed without prejudice.

Based upon the courses of conduct of the Company and of the trustee, petitioners construct their rights of action as follows:

"Petitioners would show to the Court that the filing of the bankruptcy petition by United was merely a continuation of the Company's purpose to liquidate in so far as the face amount certificates issued by it are concerned. The petition was filed at the time when the appointment of a receiver for the Company by this court, in the suit brought by the Securities and Exchange Commission, was imminent; and as a matter of fact, the filing of said petition in bankruptcy was another step in furtherance of the deliberate purpose of the officers and directors and majority stockholders of the Company to so conduct the liquidation of the outstanding collateral trust certificates as to enable the stockholders to obtain the large financial benefit that would result from a discharge of the outstanding face amount certificates by the payment to the contract holders merely of the amount of the stated cash surrender value in said certificate.

"Under the terms of the Series 'L' Investment Certificates, the Company could not call in the certificate and take it up except by paying to the record owner thereof the full amount paid on the certificate together with interest at 4½% per annum compounded annually for the time the Company has had the use of the money less any indebtedness due the Company. While detailed and exact information can only be had from an examination and audit of the books of the Company, it is apparent from the facts set forth in the affidavits accompanying the petition filed by the Securities and Exchange Commission, above mentioned, that the entire amount of the assets owned by the Company including the securities deposited as collateral under the several trust indentures at the time of the filing of the petition in bankruptcy, was not equal in value to the amount which the Company would be required to pay to contract holders under the covenants expressed in the Collateral Trust Indenture had it

undertaken to liquidate through calling in and paying off all of the outstanding certificates. If the distribution of the collateral deposited under the several collateral trust indentures is made among the contract holders on the basis of the cash surrender value of their respective contracts, there will be a surplus of approximately a quarter of a million dollars. This surplus fund, if turned over to the Trustee in Bankruptcy, together with the other assets owned by the Company, will be sufficient to pay all of the unsecured and all other claims which are not entitled to the security of the trust indenture and will leave a residue of from $350,000 to $500,000.

"United has not filed an application for a discharge and the period of six months after the adjudication allowed to a corporation within which to file an application for a discharge allowed by Section 14 of the Bankruptcy Act, has already expired.

"Petitioners further show to the Court that the great majority of the holders of the contracts are people who are inexperienced in business and financial affairs of this kind. The average amount which contract holders have paid in on their contracts is a comparatively small sum. There are more than 5,000 holders of face amount certificates issued by United Securities Company. Petitioners believe that an examination of the claims in the hands of the Trustee in Bankruptcy will disclose that comparatively few of them have been filed by lawyers. The amount involved for the average contract holder is hardly sufficient to warrant the employment of counsel to assist in the interpretation of the contracts and the preparation of claims. Consequently a large number of contract holders have not been advised that they have just claims against the Company for the amount paid to the Company on their contracts together with interest at 4½% compounded annually.

"As a consequence of this situation the continuance of the bankruptcy proceedings will result in a very heavy loss to contract holders unless they are all advised of their rights and given an opportunity to claim the full amount to which they are entitled under their contracts.

"Petitioners, therefore, charge that United has, in effect, through the bankruptcy proceedings, called in all of the outstanding certificates and by reason of the proceed-

ings above mentioned, the filing of the petition in bankruptcy and the adjudication are legally obligated to refund to the holders of all outstanding face amount certificates the amount of the payments which have been made thereon with interest. The obligation to refund the payments with simple interest exists even in the case of contracts (if there be any outstanding) which do not contain the provision expressed in the contract held by petitioner Addie K. Redmond copied in Section II of this petition, providing for a refund of payments with compound interest. The stockholders of the corporation are not entitled to any of the assets whether at the present time held in pledge under the Collateral Trust Indentures with Commerce Trust Company, the Treasurer of the State of Illinois or the Treasurer of the State of Texas, nor any of the free and unpledged assets, until all of the holders of outstanding contracts receive payment in full for the amount paid on their contracts, together with compound interest, less any indebtedness due the company, as provided in the contracts and by Sec. 1 of Article Fourteen of the Collateral Trust Indenture.

"XII.

"Petitioners aver that the amount of the just claims and demands of the holders of the Series 'L' Certificates is in excess of the collateral held by Commerce Trust Company as Trustee under the Collateral Trust Indenture for the purpose of securing said contracts. Said entire deposit is distributable pro rata among the contract holders entitled to the benefit of said deposit; and in no event will United or the Trustee in Bankruptcy of United have any interest in said deposit. Neither the bankrupt nor its Trustee in Bankruptcy have any right, title or interest in or to said securities held in said deposit; and do not have the custody or possession of said securities nor the right to the custody or possession of same.

"The agreement above mentioned between Commerce Trust Company, as Trustee, and United and its Trustee in Bankruptcy, contains the following provision:

" '6. Commerce will do none of the following things without first obtaining the approval of the bankruptcy court:

" '(a) Sell any asset or assets in the trust fund;

" '(b) Determine the surrender value of any Series "L" certificate for the purpose of liquidation and distribution as provided by the trust indenture;

" '(c) Fix the date or amount or make payment of any distribution or partial distribution of cash to certificate holders pursuant to the provisions of the trust indenture;

" '(d) Pay any attorney's fees for legal services rendered in connection with the administration of the trust estate;

" '(e) Apply any of the assets of the trust estate to the compensation of Commerce for its services as trustee under the trust indenture.'

"Petitioners aver that Commerce Trust Company, as Trustee under the Collateral Trust Indenture, had no power or authority to enter into such an agreement and that the agreement is not binding on the contract holders who are the beneficiaries of the trust.

"Commerce Trust Company as Trustee apparently has been proceeding under the erroneous interpretation of the Collateral Trust Indenture that it secures merely the amount of the cash surrender values of the outstanding contracts, and that there will be a surplus over and above said amount which will be payable to the Trustee in Bankruptcy. The Trustee, in adopting such an erroneous interpretation and in entering into the agreement with United and its Trustee in Bankruptcy, and in filing the answer taking the position which it took in the suit in the Circuit Court of Jackson County, Missouri, has been acting in excess of its powers and authority conferred by the Collateral Trust Indenture and contrary to the best interests of the beneficial owners of the securities held by it in the aforesaid trust.

"Petitioners further aver that in order to protect the interests of petitioners and all other contract holders who are the cestui que trust, it is necessary for this Court to take jurisdiction over the trust; and to administer the same by declaring the rights of the cestui que trust and distributing the fund pro rata among them.

"XIII.

"Petitioners would further show to the Court that the continuance of the bankruptcy proceedings will be highly prejudicial to the rights and interests of the numerous contract holders who have not been ad-

vised of their legal rights. In order that there may be fair and equitable distribution of the securities held in the various trusts for. the holders of the different series of investment contracts and the unpledged or general assets of the bankrupt in the hands of the Trustee in Bankruptcy, and in order that all secured contract holders may be given ample opportunity to assert their just claims against the securities held in the various trusts which form no part of the bankrupt estate and have not come into the custody or control of the Court of Bankruptcy, there should be a marshaling of assets and securities in a general equity proceeding in this Court, in which all contract holders may be fully advised as to their rights and the extent of their claims against or liens upon the several trust funds.

"In order that all parties in interest may be adequately represented, petitioners should be given leave to later join representatives of the other classes of contract holders. None of these have been joined because the list of contract holders and creditors has been impounded by order of the Court, and petitioners have not been able to ascertain the names of such creditors and contract holders who may be joined in order to fairly insure adequate representation of all classes."

The relief sought is stated as follows:

"(1) That this proceeding be sustained as a general creditors bill on behalf of themselves and all other holders of the Series 'L' Certificates outstanding and secured by the Collateral Trust Indenture under which Commerce Trust Company is named as Trustee; and also as against the other trusts in which securities deposited by United Funds Management Corporation for the security of outstanding investment certificates are being held.

"(2) That this Court declare that the securities composing the deposit of collateral held by Commerce Trust Company as Trustee under the Collateral Trust Indenture securing Series 'L' Certificates are impressed with a lien in favor of all of the outstanding certificates for the full amount paid on said certificates by the holders thereof, together with compound interest, as provided in the certificates and by the Collateral Trust Indenture; and that a similar declaration be made with respect to the other trusts in which securities deposited by United Funds Management Corporation to secure outstanding investment certificates are being held.

"(3) That it be decreed that the aforesaid agreement between Commerce Trust Company, as Trustee, and United Funds Management Corporation and Charles L. Aylward, as Trustee in Bankruptcy, was beyond the powers and authority conferred upon Commerce Trust Company as Trustee by the terms of the Collateral Trust Indenture, and is not binding upon the holders of the outstanding Series 'L' Certificates who are the beneficiaries thereunder; and that Commerce Trust Company as Trustee be enjoined and restrained from surrendering or relinquishing the exclusive custody and control over the securities constituting said trust fund.

"(4) That the trust above mentioned securing the outstanding certificates or contracts issued by United Funds Management Corporation be enforced in this cause; and that the holders of outstanding certificates who are beneficially interested in said trust be notified of the institution of this proceeding; and that appropriate orders be made requiring them to file their claims; and that they be granted all the benefits of this proceeding to which they may be entitled.

"(5) That such references or accountings be ordered as may be necessary in order to fix and determine the just claims and demands of the secured contract holders and to enforce the rights, liens and equities against the trust fund.

"(6) That petitioners be allowed their expenses and reasonable compensation to their attorneys out of the funds to be administered and distributed under orders of Court in this cause.

"(7) That petitioners have all such other, further and general relief as they may be entitled to at the hearing."

We deem a summary of this petition to be as follows: Certificates were issued by the Company on a cash surrender basis for terms of ten or of fifteen years. Such surrender values were set forth in the certificate. They began only when the certificate had been in force for eighteen months, and increased at two years and thereafter progressively annually until maturity when they equaled the face value of the certificate. Only after a certificate had been in force for five years did the surrender value equal the payments thereon. It was optional with the certificate holder as to

whether and when he would turn in his certificate and receive its then surrender value and the Company was obligated to pay such value on written request. The liability of the Company on the certificate was expressly limited to the surrender value or to an optional settlement (not here involved). To secure payment of the surrender values, a trust fund was established with Commerce as trustee. Powers were given the trustee to realize the trust fund and pay the surrender values on occurrence of stated "events of default" (among which was a voluntary or involuntary bankruptcy not dismissed within sixty days from filing) and to pay any surplus (after deduction of costs and expenses) to the Company, its successors or assigns, "or to whomever may be lawfully entitled to receive the same." Both the certificates and the trust indenture gave the Company "the right at any time at its option" to call in any certificate for payment—in which case, its obligation was to pay the full amount paid in by the holder with compounded interest of 4½%.

That the Company issued some five thousand certificates under this and other Serial trust indentures. That it deemed itself in a situation where it could not make investments sufficiently profitable to enable it to meet the maturity values of outstanding certificates. That it then had more than enough assets to pay the surrender values of all outstanding certificates but not sufficient to pay back the payments in full on certificates with compounded interest at 4½%. That it sought to meet this situation by inducing surrender of certificates at surrender values. That this resulted in much loss to holders who so acted and in gain to the Company because the Company retained the difference between the surrender value and the amount paid in where the latter was more. That the Commission interfered to prevent such procedure by the Company. Whereupon the Company took bankruptcy. That the Commerce applied in the bankruptcy proceeding for leave to bring suit against the trustee in bankruptcy to determine its powers to sell the trust fund collateral and to construe the date of determination of the surrender value under the trust indenture. That the trustee in bankruptcy pleaded the exclusive jurisdiction of the bankruptcy court over administration of the trust fund. That Commerce denied all such jurisdiction except to determine the adversary character of its position. That the two trustees entered into a stipulation-contract—approved by the bankruptcy court—whereby Commerce submitted to the jurisdiction of the bankruptcy court, except that it should have the right to bring a State court suit. That such State court suit was brought, resulting in sustaining the power of Commerce to realize the trust fund collateral and determining the date for surrender values of certificates but not determining the rights of certificate holders to a lien on the trust fund for amounts paid in by them.

That because of these actions by the Company, it has, "in effect * * * called in all of the outstanding certificates and * * * [is] legally obligated to refund to the holders of all outstanding face amount certificates the amount of the payments which have been made thereon with interest"; that there is an equitable lien upon the trust fund for such refund [8]; and that the stockholders of the Company are not entitled to any of the trust funds nor any of the free and unpledged assets until the certificate holders have been fully paid the amounts they have paid in with interest.

That because of these actions by the Commerce, it has acted in excess of its powers as trustee and contrary to the interest of certificate holders by construing the trust indenture to entitle certificate holders only to surrender values, by entering into the above contract with the trustee in bankruptcy, and by submitting to the jurisdiction of the bankruptcy court when the trustee in bankruptcy had no right, title, interest, custody, possession or right to any of the securities in the trust fund.

█ This petition is, broadly, an action by and on the part of beneficiaries for preservation and distribution of a trust fund by the trustee in accordance with the trust indenture. The immediate purpose is to establish, for the beneficiaries, an equitable lien upon a surplus in the trust fund over

---

8 There is no challenge of the right of every certificate holder to be paid the full surrender value of his certificate from the trust fund. To the contrary, counsel for plaintiffs urged, at oral argument, that such surrender values be paid without delay. The claim here has really to do only with the alleged balance in the trust fund beyond the amount needed to pay surrender values. It is upon this balance that an equitable lien is asserted for pro rata refund of payments plus interest.

and above surrender values of outstanding certificates. Such surplus is alleged to be $250,000—an amount exceeding the necessary jurisdictional amount. The interest of every certificate holder in this surplus, if a lien be established thereon, is common and undivided with rights only to prorata participation therein. These plaintiffs are fairly representative of all certificate holders. The petition asserts a right common to all. The certificate holders are alleged to be several thousand in number. This is properly a class action under Rule 23(a), Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c. For a recent opinion, in this Court, and for citation of authorities see Citizens Banking Co. v. Monticello State Bank, 8 Cir., 143 F.2d 261.

Appellee contends that this is not a class action because there is, it asserts, conflict of interests between the beneficiaries. The supporting argument is as follows. The trust indenture provides that the trust fund shall be for the benefit of all certificates "proportionately to the cash surrender values thereof." This petition alleges that the trust funds, under the several indentures, are not equal to repay the amounts paid in on all certificates with 4½% compounded interest. Under the repayment plan, the proportion of payments to surrender values would be greater in younger certificates than in older ones.[9] Also, because of the inability of the trust funds to meet in full all payments under the repayment plan, the holders of older certificates would not receive as much as their surrender values.

■ Rule 23(a) requires that those bringing a class action shall be such "as will fairly insure the adequate representation of all." Such representation is not present when there is antagonism of interests within the alleged class as to the subject matter. But this antagonism must be as to the subject matter of the suit. As stated in Hansberry v. Lee, 311 U.S. 32, 44, 61 S.Ct. 115, 119, 85 L.Ed. 22, 132 A.L.R. 741: "It is one thing to say that some members of a class may represent other members in a litigation where the sole and common interest of the class in the litigation, is either to assert a common right or to challenge an asserted obligation. Smith v. Swormstedt, supra, [16 How. 288, 14 L.Ed. 942]; Supreme Tribe of Ben-Hur v. Cauble, supra, [255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673]; Groves v. Farmers State Bank, 368 Ill. 35, 12 N.E.2d 618. It is quite another to hold that all those who are free alternatively either to assert rights or to challenge them are of a single class, so that any group merely because it is of the class so constituted, may be deemed adequately to represent any others of the class in litigating their interests in either alternative. Such a selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent, does not afford that protection to absent parties which due process requires."

■ The Hansberry case is an instance where the action was based on an agreement which "did not purport to create a joint obligation or liability." 311 U. S. at page 44, 61 S.Ct. at page 119, 85 L. Ed. 22, 132 A.L.R. 741. This petition is based upon a common and undivided obligation and liability—the preservation and proper distribution of a trust fund wherein all beneficiaries are interested in preservation of the fund and none can have legal standing to seek its distribution other than in accord with the trust indenture. The possible situation that the beneficiaries

---

[9] This is illustrated in the brief as follows:

"Plaintiff Redmond has paid a total of $795.50 in three annual and two semi-annual payments (R. 44). The total sum paid, plus interest upon each payment until September 30, 1942 (when the petition in bankruptcy was filed), at the rate of 4½ per cent per annum, compounded annually, amounts to $884.45. Her cash surrender value on September 30, 1942, was $447.50. Therefore, she claims she is secured for 197 (+) per cent of her cash surrender value.

"An examination of her certificate shows that the cash surrender values constantly increase percentagewise, compared to the amounts of the payments made upon the certificate (R. 73). Thus, the holder of another certificate, exactly the same as the Redmond certificate, except that it was issued nine years and six months before September 30, 1942 (when the petition in bankruptcy was filed), would have paid upon his certificate a total of $1,777.50. This amount with interest at 4½% per annum, compounded annually, to the date when the petition in bankruptcy was filed, would amount to $2,481.60. His surrender value would be $1,724.00. Therefore, upon the appellants' theory, he would be entitled to receive 143 (+) per cent of his cash surrender value."

may have divergent views as to their several undivided rights in the distribution of a trust fund which is alleged to be insufficient to pay all in full does not prevent this being a class action. The preservation of the trust fund is the prime jurisdictional consideration here and when a court in equity thus has jurisdiction it will retain such for the purposes of distribution in accordance with the rights of the parties in the further administration of the trust.

There is no basis in the record before us for the statement that older certificates would not be paid as much as their surrender values, if the repayment plan were applied. In fact, the scale of surrender values seems to indicate and appellee's illustration (footnote 9) seems to substantiate that the amount of any repayment plus $4\frac{1}{2}\%$ interest compounded would always be more than the surrender value. Whether the realization on the securities in any of this trust fund of Series L certificates would be so insufficient that some older certificates would receive less than surrender values, if the repayment plan were enforced as to all certificates, is problematical. The sole information as to this in this petition is that the fund is insufficient to pay all in full on the repayment plan but there is a surplus of several hundred thousand dollars above surrender values.

This situation is not, however, controlling. There is no impediment to equity working out a solution which will adequately take care of such a situation if it should prove to exist. Such solution may not be the exact one sought by appellants in their prayer for specific relief but that is not necessary. This petition states a set of facts and prays for the relief which plaintiffs specifically· think justified and also for "such other, further and general relief as they may be entitled to at the hearing." Whether plaintiffs sufficiently allege or prove their right to all of the relief prayed is not necessary. "It is enough at this time to determine that the bill contains allegations which, if proved, entitled petitioners to some equitable relief." Deckert v. Independence Shares Corp., 311 U.S. 282, 289, 61 S.Ct. 229, 234, 85 L.Ed. 189.

### Jurisdiction of Bankruptcy Court.

This issue grows out of the situation following. After the adjudication in bankruptcy, Commerce contemplated realization of the collateral in this trust fund. Evidently this had in view the further administration of the trust by distribution of fund when converted into cash. As it construed the trust indenture, distribution meant payment of surrender values of outstanding certificates and of any balance thereafter to the Company or, probably, to the trustee in bankruptcy of the Company. To carry out this line of action, it applied to the bankruptcy court for leave to sue the trustee in bankruptcy in a State court to determine its right to sell the collateral and, being in doubt as to the date when surrender values were to be ascertained, to construe the trust indenture thereon in the light of the occurrence of the bankruptcy proceedings. That application was met by the contentions of the trustee in bankruptcy that there was no need for such State court suit; that such sales should be under the jurisdiction of the bankruptcy court and that Commerce (as such trustee) should be made a party, to the bankruptcy proceeding. To this, Commerce responded that the trust fund was in its exclusive possession; that it claimed title thereto adverse to the trustee in bankruptcy; and that the bankruptcy court had no jurisdiction to make it a party to the bankruptcy proceeding nor for any purpose except to determine whether its adverse claim was substantial or merely colorable. This was the situation when the contract-stipulation was entered into between the two warring trustees. With approval thereof by order of the bankruptcy court, this controversy between the trustees was ended.

The main results from the contract were that Commerce retained undisturbed its possession and title to the securities in the trust fund; that it should perform its duties as trustee in liquidation and distribution of the fund, for which it should be compensated; that such duties could be performed only on advance approval of the bankruptcy court and that allowances to it must be approved by that court; and that Commerce might bring an action in the State court to determine its power of sale of trust collateral and to determine the date for ascertaining surrender value of certificates. In short, Commerce voluntarily submitted its administration of the trust to the jurisdiction and control of the bankruptcy court.

As to the matters particularly involved in the present suit—the rights to refund of payments on certificates and to an eq-

uitable lien on the trust fund for such refunds—they would seem clearly covered by the contract provision that approval of the bankruptcy court was necessary before Commerce should "Fix the date or amount or make payment of any distribution or partial distribution of cash to certificate holders pursuant to the provisions of the trust indenture." That Commerce so construes the contract is evident from its answer to the cross-bill in the State court suit where it pleaded that the "Bankruptcy Court has prior and exclusive jurisdiction to determine whether or not the said * * * [plaintiffs in cross-bill] are entitled to any preference, priority or lien, upon the proceeds of the collection of such assets, over, above and in addition to the amounts of their surrender values as provided in their said certificates."

On the above outlined situation, the contested jurisdictional issue is whether Commerce, as trustee under the indenture, had power to enter into this contract submitting control of its administration of the trust to the bankruptcy court. Appellants contend that the title and possession of the trust fund was held by Commerce adversely to the trustee in bankruptcy; that it was the duty of Commerce to assert and maintain such position; that, if so maintained, all judicial control over the administration would have to be by a court of equity in a plenary suit and not in the bankruptcy proceeding; that Commerce had no power to consent to a transfer of such judicial control to the bankruptcy court; and that, therefore, the contract was invalid and the attempted consent to such jurisdiction was void. Appellee concedes that the title and possession of Commerce was adverse to the trustee in bankruptcy but asserts that the contract is valid and the jurisdiction of the bankruptcy court is exclusive. The supporting argument that the contract is valid is along the line following: the contract makes no surrender of possession of the securities nor of the discretion of Commerce in administering the fund; it gives no determination to the trustee in bankruptcy or to that court as to whether, how, when or upon what terms the securities should be sold; it gives to the bankruptcy court merely a power of veto (by withholding approval) to the kinds of acts by Commerce specified in the contract; the bankruptcy court has inherent power to prevent any of such acts through injunctive proceedings to prevent improvident action or waste since, under one construction of the trust indenture (certificate holders entitled only to surrender values), there would be a balance in the trust fund to go into the bankrupt estate; it is the duty of Commerce to exercise wise judgment and prudence in protecting and administering the trust fund; Commerce has power, as trustee, to compromise litigations and disputes concerning the trust when so authorized by a court of equity; this contract settled the disputes and litigation with the trustee in bankruptcy to the benefit of the trust by avoiding existing and possible litigation.

To this appellants oppose as follows: The trustee in bankruptcy has no interest in this trust fund because the unpledged assets in the estate are more than enough to pay all common creditors, costs and fees in the bankruptcy proceeding; the contract is detrimental to certificate holders because (1) Commerce will pay only surrender values and then turn over balance to trustee in bankruptcy, (2) bankruptcy court has no right to determine how distribution shall be made and, therefore, should have no veto power thereon, (3) if bankruptcy court had such right, there would be additional burden on certificate holders because of fees of trustee in bankruptcy and his counsel for taking this fund from the certificate holders, (4) delay in administration has been caused since Commerce might already have distributed the surrender values and this controversy could already have been determined if Commerce had filed an action for that purpose, and (5) this controversy cannot be resolved in the bankruptcy court with fairness and justice to the certificate holders.

The controlling issue here is the power of Commerce to make this stipulation-contract. Determination thereof depends upon the terms of the trust indenture, the legal obligations, duties and powers of this trustee, and the situation in which it acted.

Under the indenture (Article Five),[10] Commerce was, on occurrence of any "events of default," empowered to proceed "in equity or law" for specific performance of any agreements or covenants of the indenture or in aid of any power granted in the indenture or it might proceed to realize on the trust collateral (through legal action or otherwise) and to apply the proceeds. Such an event of default occurred

---

[10] This Article quoted in footnote 5 hereof.

when the voluntary petition in bankruptcy was filed and not dismissed within sixty days. Thus, power to invoke such judicial action as Commerce "in its discretion" deemed necessary for accomplishing these purposes was expressly granted in the indenture.

■ Aside from the indenture, the statute law of Missouri (this being a Missouri contract) empowers a trustee of an express trust to sue in his own name without joining beneficiaries. Mo.Rev.Stat. 1939, § 850, Mo.R.S.A. § 850, Laws of Mo. 1943, p. 360, § 11, Mo.R.S.A. § 847.11; Beck v. Hass, 111 Mo. 264, 20 S.W. 19, 20, 33 Am.St.Rep. 516. It is the duty of a trustee to exercise this, as well as all other of his powers in good faith (Thompson v. Hays, 8 Cir., 11 F.2d 244, 247) and with the care, skill and prudence which a man ordinarily uses in his own transactions and in handling his own property under like circumstances. Same citation; American Bonding Co. of Baltimore v. Richardson, 6 Cir., 214 F. 897, 901; Grimes v. Grimes, D.C. Nev., 52 F.2d 171, 175. The acts of a trustee must be judged by the facts and circumstances affecting his action. Dibert v. D'Arcy, 248 Mo. 617, 154 S.W. 1116, 1125; In re Clark's Will, 257 N.Y. 132, 177 N.E. 397, 398, 77 A.L.R. 499.

The facts and circumstances here affecting the actions of Commerce in making this contract were as follows: Default had occurred justifying Commerce in proceeding, under the indenture, to realize the collateral and make distribution of the proceeds to certificate holders. Under its construction of the indenture that certificate holders were entitled only to receive surrender values, there was a probable balance in the trust fund which would go into the bankruptcy estate. In this situation and desiring the protection of an instruction of a proper court of equity as to its powers of sale of the collateral and as to the date for fixing surrender values, it applied to the bankruptcy court for leave to sue the trustee in bankruptcy in the State court for these two purposes. There it was met with the challenges that there was no necessity for the instructions sought and that the sale or liquidation of the collateral should be in the bankruptcy court and Commerce should be made party to the bankruptcy proceeding. Commerce answered claiming title and possession adverse to the trustee in bankruptcy and denying any jurisdiction in

that court except to determine the good faith of its adverse claim.

■ There can be no doubt of the power and the right of Commerce to seek the instructions of a proper court of equity as to the two above matters. While it might have put its own construction upon the indenture and gone ahead in reliance thereon, yet it would have proceeded at its peril and would have been liable to interested parties injured by a misconstruction. It was not compelled to take this risk. Where a change in the character of the trust fund is involved, it is always safer for a trustee to act under court instruction. Gamble v. Gibson, 59 Mo. 585, 595, 596. It could have filed its petition for such instructions in the proper State court without application for leave to sue the trustee in bankruptcy. However, it conceived that the bankrupt estate had an interest in such litigation because of the probable balance of the trust fund which would come to the estate. Therefore, it desired the trustee in bankruptcy to be made a party to such suit and bound thereby. It was not improper for Commerce to apply to the bankruptcy court for leave to make the trustee a party thereto. When it sought so to do, Commerce was met with the contention that the sale and liquidation of the collateral was in the bankruptcy court. This Commerce denied setting up its adverse claim. Thus it was faced with litigation as to its status as an adverse claimant. It could have pursued this litigation. If successful, as it probably would have been in so far as the jurisdictional issue raised by the trustee in bankruptcy, it would have been about where it started, i. e., with its application to sue the trustee in the State court determined or undetermined. There would have been the delay consequent from a trial on and the determination of the jurisdictional issue, with possible appeal therefrom. It was "in settlement" of these controversies that the contract was made.

■ It is the law that a valid compromise of an existing controversy may be made by the parties thereto, subject to their capacity to contract concerning the subject matter. 15 C.J.S., Compromise and Settlement, p. 716, § 6 and citations. The capacity of trustees so to contract as to bind their beneficiaries is limited because of their fiduciary character. Purcell v. Robertson, 122 W.Va. 287, 8 S.E.2d 881, 882. Where it is reasonably prudent, in the ex-

ercise of good faith sound judgment, to make a contract of compromise, the trustee may do so (Purcell v. Robertson, 122 W.Va. 287, 8 S.E.2d 881, 884; Jones v. Jones, 297 Mass. 198, 7 N.E.2d 1015, 1020; Kinion v. Riley, 310 Mass. 338, 37 N.E.2d 984, 985; Sheridan v. Riley, 133 N.J.Eq. 288, 32 A.2d 93, 95; Butler v. Butler, 180 Minn. 134, 230 N.W. 575, 579; Mann v. Day, 199 Mich. 88, 165 N.W. 643, 646), but, if such compromise is made without proper court approval, the trustee takes the risk of his good faith and sound judgment being attacked successfully by the beneficiaries. Jones v. Jones, 297 Mass. 198, 7 N.E.2d 1015, 1020; Sheridan v. Riley, 133 N.J.Eq. 288, 32 A.2d 93, 95. If the compromise is made only upon proper court approval, the trustee may safely do so and such is binding upon the beneficiaries. Herman v. Mueller, 314 Ill.App. 663, 42 N.E.2d 303, 304; Bennett's Guardian v. Cary's Ex'r and Trustee, 210 Ky. 725, 276 S.W. 818, 820. Here, this stipulation-contract was, by its express terms, not valid until approved by the bankruptcy court. The litigation was in that court. That court had jurisdiction even over adverse claimant situations if consented to by the adverse claimant. It had, therefore, jurisdiction to approve the stipulation-contract and to exercise jurisdiction to the extent stipulated therein.

While the action of that court in approving the stipulation-contract and in assuming jurisdiction is not properly before us, it is not amiss to state that such action seems not mistaken. The validity of any lien, under the trust indenture or otherwise, upon the trust fund is not altered in any particular. There is no impediment to the full enforcement of any such lien. See Isaacs v. Hobbs Tie & T. Co., 282 U.S. 734, 738, 51 S.Ct. 270, 75 L.Ed. 645. The only change is in the tribunal which is to determine such issues. This change is from a court of equity to a bankruptcy court exercising equitable powers. This is merely a procedural change without substantial difference. Appellants can proceed as fully in the bankruptcy court as in a court of equity.

Since the subject matter of this petition is within those covered by the stipulation-contract and since those matters are, because of the approved stipulation-contract, now within the exclusive jurisdiction of the bankruptcy court, we think the dismissal of this petition in a court of equity for want of jurisdiction was proper.

Since jurisdiction in this court of equity fails, we do not consider the sufficiency of this petition to state a cause of action.

The order of dismissal is affirmed.