STATE OF MONTANA on the relationship of JOHN K. BEUMEE, guardian ad litem of BOBBY RAY TANNER, a minor, Relator, v. THE DISTRICT COURT OF the SIXTEENTH JUDICIAL DISTRICT of the State of Montana, IN AND FOR the COUNTY OF POWDER RIVER and the Honorable JACK D. SHANSTROM, Judge thereof, Respondents.

No. 11497.

Submitted June 5, 1968. Decided July 15, 1968.

443 P.2d 486.

Randall Swanberg, argued, Swanberg, Koby & Strope, R. W. Walsh, Jr., appeared, Great Falls, for relator.

Lucas & Jardine, Miles City, Anderson, Symmes, Forbes, Peete & Brown, Benjamin Forbes, argued, Billings, for respondents.

MR. JUSTICES CASTLES delivered the Opinion of the Court.

This is an original proceeding seeking a writ of supervisory control over the district court to vacate orders, judgment and decree in certain district court cases in Powder River County as well as for other relief that will hereinafter appear.

We issued an order to show cause ex parte. Following a return, answer, briefs, and oral arguments, on June 24, 1968, we issued our order as follows:

"In this original proceeding by a Guardian Ad Litem against the District Court seeking a Writ of Supervisory Control to vacate orders and judgment; and also to direct the District Court to order the trustee-guardian of a minor and an estate held in trust to execute a certain oil and gas lease or, in the alternative on Order to Show Cause, joining certain other respondents.

"Answer was filed, the original Court files in Causes No. 860, 765 and 1199 of the Sixteenth Judicial District, in and for Powder River County were submitted as well as a transcript of hearing and certain depositions. Briefs were filed and oral argument was had.

"Now, after fully considering the entire record and the law applicable, and because of the importance of an early disposition, we ORDER as follows:

"1. The application for a Writ of Supervisory Control is denied.

"2. Our previous order of May 21, 1968, staying further activity is terminated and the action dismissed.

"An opinion will follow."

This is the opinion.

The relator, Beumee, is the guardian ad litem of one Bobby Ray Tanner, a minor. The minor through his guardian ad

litem filed suit in Powder River County in cause No. 1199 against Ben Heidel, his, the minor's, general guardian of the estate and person of said minor. Also included as defendants were Samuel Gary and Sinclair Oil and Gas Company. The guardian ad litem's suit against the general guardian is further complicated by the declaration, subsequent to the initiation of the suit by the minor now nearing majority (four months), that the general guardian's actions should be approved.

Three causes in the district court are involved here. Probate Cause No. 765 is the probate of the will of Shirl Tanner. Probate Cause No. 860 is the guardianship of the minor, Bobby Ray Tanner. Civil Cause No. 1199 is the suit mentioned above, the guardian ad litem against the general guardian.

Shirl Tanner, a resident of South Dakota, during his lifetime, owned a ranch, among other things, in Powder River County, Montana, containing some 1,914 acres of deeded land. In his will probated in Cause No. 765, the ranch was devised to the widow, Viola Tanner, in trust for her use with full authority to manage; it directed the trustee to transfer the ranch to son Bobby upon his reaching majority. Shirl Tanner died February 15, 1962. His will was probated in South Dakota, and then as a foreign will in Montana. His widow, Viola, was execturix. She was killed in a car accident in March 1963. The will of Shirl Tanner did not provide for a successor trustee, and none was appointed as such.

The Montana attorney for the estate petitioned for letters of administration with will annexed, there being no relative or heirs in Montana. Interestingly, the appraised value of the entire ranch was $15 per acre, including leased land, for a total of $45,300. On September 16, 1963, letters of administration with the will annexed were issued. Inheritance taxes were computed. Then appears a guardian of the person of the minor, Bobby Ray Tanner, in Idaho who was allowed expenses by the Montana court. In December of 1963, and April

1964, the administrator with the will annexed received $3,534.57 as oil lease and grazing rentals. Prior to completion of the probate, the Montana administrator with will annexed, Bruce M. Shelden, died August 6, 1965.

Another Montana attorney, Robert J. Brooks, then was appointed administrator with will annexed. He made a final account and petitioned for distribution. In this account, filed July 28, 1967, the administraor with will annexed reported having received the real property of the ranch as well as grazing lease payments and oil lease payments. These funds were reported and used to pay costs of administrative, real estate taxes, and expenses of the minor, Bobby Ray Tanner.

On September 19, 1967, a decree of distribution was entered, one of the terms of which was a clause distributing the real property to Ben Heidel, as trustee and guardian for the minor, Bobby.

During the pendency of the probate of the Shirl Tanner will, and in separate proceedings denominated "In the Matter of the Estate and Guardianship of Bobby Ray Tanner", Cause No 860, an order was made appointing Ben Heidel as guardian of the person and estate of Bobby, the minor. This was on August 22, 1966.

In October 1966, the guardian, Heidel, petitioned the court for approval of an oil and gas lease for ten years at $1 per acre per year, for a total of $1,914.47 per year, plus $\frac{1}{8}$ royalty. Notice was published, appraisers appointed; and on February 10, 1967, an order was made approving the lease to Samuel Gary. This all in probate No. 860. At this time the minor was an inmate of the South Dakota penitentiary.

In June 1967, oil was discovered in the Bell Creek field. Since the discovery, indicative of the fabulaus growth of the field Samuel Gary has drilled over 100 wells, over 95 percent being producers. Needless to say, the interest in oil leases increased.

In September 1967, it was discovered that 120 acres of the

Tanner property in a different township and range was still not leased for oil and gas exploration. In September, Heidel, as guardian of Bobby Tanner, filed a petition for an order authorizing him to lease the 120 acres. This was in probate No. 860.

On October 23, 1967, in probate No. 765, Heidel was appointed trustee, as successor trustee of Viola Tanner, the widow of Shirl Tanner, who became deceased in March, 1963. As related before, there were succeeding administrators with will annexed and guardians of the person and estate of Bobby Tanner, the minor; but technically no successor trustee, named as such, had been sought or appointed. We note, however, as previously stated, that Heidel had the appelation of trustee as well as guardian in the order distributing the estate.

On October 24, 1967, in probate No. 765, Heidel, as successor trustee, obtained an order authorizing him to lease the 120 acres mentioned above in probate No. 860. At about the same time a guardian ad litem, a Mr. Pemberton, was appointed to represent the minor. Both Pemberton, the guardian ad litem, and the minor, Bobby Tanner, signed consents for the lease. At an auction the 120 acre lease brought a bonus payment of $178,000. The lease was approved by the court. Although this 120 acre lease is not involved in the present case, the facts concerning it add to the drama of what came next. The auction was held October 27, 1967. On this 120 acre lease auctioned separately, 3 wells were drilled. Two of them were dry wells and abandoned. The third well produced 20 to 25 barrels per day, barely commercial. We mention this in passing to highlight what we later refer to as risk involved.

On November 12, 1967, Heidel, as trustee, ratified the previously made lease approved by order of February 10, 1967, when he was guardian. This ratification was done without further court ratification. It was also done after the previously mentioned auction and leasing of the 120 acres.

We note here that Heidel ratified the lease on 1900 acres at

à bonus of $1900 at a time when he knew the price of $178,000 had been paid for 120 acres. But, more appears later.

Beumee, the relator here, was at the time an independent petroleum landman and operator in Billings. He became active in the Bell Creek field in 1967, apparently following the discovery of oil. When the 120 acres of the Tanner ranch was discovered to be unleased, Beumee was representing Wolf Land Company. Wolf Land Company was not interested so Beumee called King Resources Company of Denver; King Resources Company was interested. Beumee inquired of Heidel and Heidel's response caused Beumee to: "Well, this is just like waving a red flag to a land man and I said to myself, 'All right, if there is some reason why he cannot lease the hundred twenty acres and there is already nineteen hundred acres that he has leased, there has got to be something wrong with the nineteen hundred acres.' "

Beumee pursued the matter and as he put it, "realized that what to me was a glaring error, that it was impossible for Ben Heidel, acting in his capacity as guardian of the person and estate of Bobby Ray Tanner, a minor, to lease this land." This was sometime about two weeks prior to the auction of the 120 acre lease.

Beumee, at this point, knew that Heidel was guardian of the minor and his estate. He knew, too, that Heidel was the successor trustee. Beumee contacted King Resources Company, discussed the 120 acre lease and told them there appeared to be a "void lease on nineteen hundred acres and they suggested that I follow up on it, which I did."

Beumee found the minor in a bowling alley in American Falls, Idaho. Without talking to Heidel, the guardian, Beumee drew a retainer agreement preliminary to seeing Bobby Tanner. Bobby talked to Beumee "at length." He then, according to Beumee, wanted to talk to people in Montana and called Judge Martin, the probate judge, his guardian Heidel, and Mr. Lucas, an attorney in Miles City. Beumee testified

that the consensus of the phone calls was the advice to the minor that he should do nothing. He, Beumee, then added, "nothing until he [Bobby] had had any papers I might prepare reviewed by an attorney of his choosing." Beumee was present when Bobby talked on the telephone, but didn't speak to Judge Martin, Heidel or Mr. Lucas.

Beumee then took Bobby to an attorney in Rupert, Idaho, who reviewed the rough documents, three in number, and following corrections, Bobby signed all three. One, the retainer agreement; another a letter to Ben Heidel to cooperate with Beumee; and the third a royalty deed. This was on October 25, 1967.

These documents are something! The retainer agreement, which Beumee paid $500 for, guaranteed that Beumee would attempt to break the lease on the 1900 acres that had been issued to Samuel Gary; and, if successful, Bobby would give Beumee a lease for a bonus of some $191,000 or $100 per acre, *unless exploration discredited the oil and gas potential in which event Bobby would get nothing;* Bobby would assign $3\frac{1}{8}$ percent royalty to Beumee. The agreement then provided that if Beumee was not successful in setting aside the lease, but could secure a settlement or compromise beneficial to the trust, then Beumee was to get 1/3 of the settlement or compromise. The third document above was a royalty deed of the $3\frac{1}{8}$ percent from Bobby to Beumee.

Beumee, as mentioned before, had made arrangements with King Resources Company for financing the transaction. He obtained from King Resources Company a letter of intent, dated November 20, 1967, in which King Resources Company agreed to put up $191,000 minimum.

The letter of intent relates that Beumee previously had returned the aforementioned $3\frac{1}{8}$ percent royalty deed signed by Bobby Tanner in order to make a lease equal in every respect to the Gary lease, and that the $3\frac{1}{8}$ percent royalty deed was no longer in effect. The letter of intent goes on to say: "If your

efforts in obtaining the lease are successful, King Resources Company will assign to you an overriding royalty of 2.0833%, said overriding royalty to be paid solely from King Resources Company's working interest."

Beumee, armed with now four documents, filed a petition, through his counsel, for appointment as guardian ad litem of Bobby Ray Tanner. This was on November 20, 1967. Beumee became an employee of King Resources Company on December 1, 1967.

Our recitation of the facts here may seem confusing in that there are nine personal representatives of the minor in some manner having had a hand in the minor's rights (for want of a better term). These are, by way of summary, (1) the mother as executrix of the Tanner will, (2) the first administrator with will annexed, Shelden, (3) the second administrator with will annexed, Brooks, (4) a guardian of the minor in Idaho, (5) a guardian (and trustee) of the person and estate of the minor in Montana, Heidel, (6) a trustee of the estate, Heidel, (7) a guardian ad litem, Pemberton, (8) the State of South Dakota, and (9) a guardian ad litem, Beumee.

On November 21, 1967, Beumee was appointed guardian ad litem for the purpose of litigating the Gary lease. Judge Martin, before whom the hearing was held, *was not* advised of the agreement with King Resources Company. Judge Martin shortly thereafter disqualified himself and Judge Shanstrom assumed jurisdiction.

On the same day Beumee filed his complaint in cause No. 1199 against Sam Gary and Heidel. Sinclair Oil Company was subsequently added as a party defendant. The complaint of Beumee sought to have the lease from Heidel, as guardian, to Samuel Gary cancelled. We recall that Heidel in his new capacity as trustee had ratified the Gary lease on November 12, 1967. The thrust of the complaint was that Heidel as guardian—rather than as trustee—could not lease the property; and thus the lease was void.

Answer was filed by Gary and Sinclair Oil Company. The thrust of the answer was that the minor, Bobby Tanner, whether through a general guardian or a guardian ad litem, was estopped from denying the validity of the lease; that in any event the lease was valid either by reason of the decree of distribution in the probate or by that decree plus the formal appointment of Heidel as trustee and subsequent ratification of the lease.

A counterclaim and cross-claim was also filed by Gary and Sinclair Oil Company seeking to quiet title to the lease. The trustee Heidel also answered largely leaving the matter for determination by the court.

Following the answers, and on March 21, 1968, in probate No. 765, Estate of Shirl Tanner, deceased, the trustee Heidel petitioned the court for authority to offer judgment in compromise of the litigation in civil cause No. 1199. On the same day Heidel, as guardian of the person and estate of Bobby Tanner in probate No. 860, petitioned for authority to consent to the proposed offer of judgment.

On March 26, 1968, in probate No. 860, Beumee as guardian ad litem in civil cause No. 1199, objected to the compromise proposed. Likewise in probate No. 765. In civil cause No. 1199, that same day, Beumee as guardian ad litem, moved for summary judgment, seeking a judgment that the lease held by Gary was void.

We shall return to the various legal steps leading to the judgments and order involved in this original proceeding. But, first we shift to the minor, Bobby Tanner, since his part in all of the above maneuvers is important.

Bobby will become 21 years of age on November 30, 1968, a short few months away. He is old enough to have served time in a penitentiary, but still legally a minor. Bobby signed the agreement with Beumee and received $500 in cash. Very shortly, along about Thanksgiving, 1967, he changed his mind. He visited with his guardian and trustee Heidel who took him

to see counsel, Lucas. Following this, the minor rejected or disaffirmed the previous agreement made with Beumee and returned the $500 to him. Beumee rejected the certified check.

Following this appear maneuvers at settlement, the details of which do not fully appear. However, a handwriten letter of Beumee's to Bill O'Dell, an attorney for Gary, appears as "Exhibit No. 2". Herein appear the flavor of Beumee's actions:

"Sunday morning

"Bill,

"I'm not going to apologize for a handwritten note—you know how the oil business works as well, or better, than I do.

"It seems to me both Gary and ourselves have a position in the Tanner Estate that needs to be protected. And, while I didn't think so at the beginning, I now believe a ½ of the pie is better than a long court fight, or bidding each other right out of the ballpark. Make no mistake though Bill (and I guess you know me well enough that I really don't have to say this) I've got the best attorneys money can buy, and a relationship with the interworkings of the judicial in southeastern Montana that is unbeatable. Also, you might tell Sam that if we get into a bidding position, I won't even look at my hole card til we've passed 1 million bucks.

"Bill, I've got to give one of the companies I represent a fast hand in closing up some 'windows' in a couple of lease blockings in the Bearpaws, so I'll be staying at the O'Haire in Great Falls for a few days. However, my secretary in Billings (245-7130) always knows where I am, so I'm sure we can find each other when you're ready to visit further about this.

"One other thing, it's my opinion that attempting to secure a ratification of a $1,900 lease from the Trustee at this time and in light of the bidding on the 120 acre tract, will place Gary in a very bad lite with Judge Martin. If you agree I think you should tell Gary to call his boy off Ben Heidel in Broadus.

"You know, its amazing to me that the rather glaring defects in the proceedings and lease haven't been caught by others who check records—however, to the best of my knowledge I'm the only outsider who recognized the situation. I do think its to our mutual advantage to attempt a solution without any delay, because frankly it sorta scares me to think what Davis would do if this gets out in the open.

"Well Bill, these are my thoughts and I'm now looking forward to your analysis of our problem.

"Best regards,
"John"

The reference to the "relationship with the interworkings of the judicial in southeastern Montana that is unbeatable" will be passed without comment. What is of interest is the statement that: "I do think its to our mutual advantage to attempt a solution without any delay, because frankly it sorta scares me to think what Davis would do if this gets out in the open."

Davis, colorfully referred to in the record as "Tiger Mike Davis", holds considerable acreage in the field and has offsetting wells. Beumee admitted on cross-examination that he had not tried to obtain an offer from any other oil company. This, of course, highlights his own personal pecuniary interest and also discloses his own feeling that, "½ of the pie is better than a long court fight * * *".

We return now to the proceedings in the offer of judgment to compromise the litigation in civil cause No. 1199 and in probate Nos. 860 and 765. The petition for authority to offer judgment recited that Gary was willing to match the bonus payment offered by Beumee in the amount of $191,447 or $100 per acre.

On April 3, 1968, Heidel, as trustee, withdrew his petition for authority to compromise on April 12, 1968, filed a second petition reciting that defendants, Gary and Sinclair Oil Com-

pany, were now willing to offer approximately $300,000 as a bonus payment.

Beumee filed objections and "upped" his offer to $350,000.

On April 29, 1968, hearing was held on the second petition for authority to compromise and on a motion for summary judgment by plaintiff in cause No. 1199. Testimony was taken at that hearing regarding the willingness and ability to pay the bonus payment, of $350,000 by Beumee. Other testimony was taken to the effect that Heidel was aware of the higher offer of $350,000; and that drainage was occurring by reason of offset wells.

In addition to offering approximately $300,000 bonus payment, the offer of compromise by defendants Gary and Sinclair Oil Company in effect indemnified the minor as against Beumee and guaranteed the costs and travel expenses.

Full consent of the sole beneficiary, the minor, was had. The minor had been fully advised.

After the hearing, the district court approved the offer of judgment in civil cause No. 1199 and judgment was entered, approving the oil and gas lease to Gary and Sinclair Oil Company at the compromise bonus figures.

The application to this Court for a writ of supervisory control followed. The application asked that the orders, judgment and decree in the causes above mentioned be vacated; that this Court direct the trial court to authorize and direct the trustee-guardian to execute a lease to Beumee *or* that an auction be held on the leasing rights.

We issued on order to show cause and answer and return was made and oral argument had. No issue is presented concerning the exercise of original jurisdiction in this Court.

The sole issue now is: was the compromise settlement made by the trustee valid?

Under the trust provisions of the will, the trustee Heidel might have compromised without court approval; but since court approval was sought and had, our inquiry comes down to

whether or not the court abused its discretion in finding that the compromise was "reasonably prudent". Redmond v. Commerce Trust Co., 323 U.S. 776, 65 S.Ct. 187, 89 L.Ed. 620, 8 Cir., 144 F.2d 140; Mann v. Day, 199 Mich. 88, 165 N.W. 643.

Relator here starts with the premise that the original Gary lease was void and any subsequent ratification was likewise void. We are not here called upon to make a definitive determination of that problem, nor of the problem of estoppel. Our foregoing fact recitation, however, indicates at the very least, a justiciable issue on that score. For example: (1) Was Heidel a de-facto trustee during the original probate? He was called that. (2) Would an estoppel arise? (3) Would subsequent ratification by the trustee be operative?

In all these questions, one fact is clear, Gary was in good faith in his original $1 per acre lease. That was before the discovery of oil and was the going rate for such leases. As a matter of fact, prior to Gary's lease, and during the probate of the will, receipts for $1914.57 in December of 1963, for a lease to Atlantic Refining Corporation appears. Atlantic's lease was apparently abandoned. These questions, even without answers, clearly indicate that in civil cause No. 1199, the defendants Gary and Sinclair Oil Company had in their answer and cross-complaint set up serious legal problems concerning the trust estate.

Against this was Beumee, the guardian ad litem with a personal ax to grind. His so-called "Retainer Agreement" had the neat escape clause, unless "the oil and gas potential is considered by him as discredited by exploration in the area". He took royalty to himself. He dropped this when he had achieved royalty from his financial backer, subsequent employer, King Resources Company.

We shall not dwell on the guardian ad litem activities except to observe that his efforts are a persistent attempt to personally benefit under the guise of a guardian ad litem's protection of his ward.

Relator Beumee's contention is that the compromise settlement

was not reasonably prudent because the guardian ad litem, the same relator Beumee, had offered the ward, through the trustee, approximately $50,000 more than Gary and Sinclair Oil Company. But what this contention overlooks is that by making the compromise settlement with Gary and Sinclair Oil Company, the trustee Heidel has guaranteed the ward approximately $300,000, *and completely eliminated the risk of losing the litigation and receiving only $1,980.*

Would it be reasonably prudent to risk a guaranteed $300,000 in an attempt to obtain $350,000 where, if unsuccessful, one would only receive $1,980? To ask the question in the light of the circumstances here is to answer it. From the testimony it is a conservative estimate that the ward's ⅛ royalty will yield $360,000 per year. In other words, production royalty payments are the real source of value to the ward under the circumstances here.

Judge Shanstrom had these factors to consider: (1) the wishes and desires of (a) the trustee, and (b) the beneficiary and ward; (2) the seriousness of the litigation and the apparent legal position of Gary and Sinclair Oil Company; (3) the risk; (4) the equities favoring Gary; and (5) the admitted personal pecuniary interest of Beumee, the only protestant. Weighing all of these in the light of the circumstances, we cannot say that Judge Shanstrom abused his discretion in approving the compromise.

It was for these reasons the order of June 24, 1968, denying the petition was made with this opinion to follow.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES HASWELL, ADAIR and JOHN CONWAY HARRISON, concur.