## CHARLESTON.

SAMUEL H. MEYERS *v.* WASHINGTON HEIGHTS LAND COMPANY, *a corporation, and others*

*and*

ALEX. MEYERS *v.* WASHINGTON HEIGHTS LAND COMPANY, *a corporation, and others*

(Nos. 6324, 6324-A)

Submitted September 17, 1929.   Decided October 2, 1929.

634

*McKee & Luckey,* for appellant Daily Gazette Co.

*Jo N. Kenna,* for appellant Meyers.

*W. G. Brown* and *A. J. Horan* and *H. W. Bowers,* for appellee bondholders.

*Graham C. Painter, Joe L. Silverstein,* and *Davis, Painter & Silverstein,* for appellee Atlas Mortgage & Finance Co.

MAXWELL, JUDGE:

These two suits involve the affairs of the Washington Heights Land Company, a corporation. The first suit is for the winding up of the business of the company. The second suit is for the cancellation of a release of a vendor's lien and of asserting said lien for the benefit of certain notes held by the plaintiff in the second suit. The two causes were consolidated and referred to a commissioner in chancery to make and state a report covering various matters specified in the order of reference. Among other things, the commissioner found that Alex Meyers, plaintiff in the second suit, was not entitled to cancellation of the release of the vendor's lien asserted by him, nor to enjoy the benefit of such lien, and disallowed a certain execution lien asserted by Daily Gazette Company, a corporation. Both the Daily Gazette Company and Alex Meyers appealed.

In January, 1923, The Washington Heights Land Company purchased certain land in the vicinity of Charleston for $75,000, whereof it paid $9,000 cash and executed its several notes for the residue of $66,000. These notes were secured by vendor's lien. Among the notes, were two for $3,600.00 each payable to one of the two grantors, and another note for $7,800.00 payable to the other grantor. These three notes matured for payment December 14, 1923. Some months before their maturity the notes were assigned for value by their respective payees to Atlas Mortgage and Finance Company. The assignments were recorded in the office of the clerk of the county court of Kanawha County under the provisions of a then existing statute. Acts 1921, Chapter 61. This statute was repealed two years later. Acts 1923, Chapter 61. On the maturity date of said notes they were purchased of the Atlas Mortgage and Finance Company by Alex Meyers,

who took from said company a formal assignment thereof, but, the aforesaid statute of 1921 requiring such assignments to be recorded having been repealed, the assignment to Meyers was not recorded. The purchase price for said notes was their face value and accrued interest and a bonus of some sort was also included. The aggregate was $16,332.50. In satisfaction of the purchase price Meyers paid the Atlas Company in cash $8,332.50, and executed to said company his note for $8,000.00 and placed with said company as collateral security for his said note the above mentioned three vendor's lien notes.

In January, 1924, The Washington Heights Land Company arranged to issue bonds to the extent of $200,000, and to secure the same executed a deed of trust on the land hereinbefore mentioned. The trustee was Central Trust Company. The first of the bonds to be disposed of were sold and delivered February 11, 1924; the deed of trust securing the bonds was placed of record February 19th. In the same month the money received from initial sale of bonds was employed in the discharge of vendor's lien notes which were held by divers individuals. This service was rendered by Russell G. Quarrier, vice-president of Central Trust Company, trustee under the deed of trust. In pursuance of this program the Central Trust Company on the 25th day of February, 1924, paid to Kanawha National Bank for the Atlas Mortgage and Finance Company the sum of $7,740.00 (being the amount of the Alex Meyers Collateral note aforesaid, less a credit of $260.00 for unearned interest) and received from the said National Bank in accordance with instructions which had been given to it by the Atlas Company, the three vendor's lien notes aforesaid, the Alex Meyers collateral note of $8,000, and a release of the vendor's lien aforesaid, which release had been executed on behalf of the Atlas Company by W. M. Gillie, president. This release was placed of record March 4, 1925. The issue drawn between Alex Meyers and the bondholders is as to whether the said release is binding and effective as to him.

We start with the proposition that Alex Meyers bought the three vendor's lien notes; that he paid valuable consid-

eration therefor; and that he took a proper assignment of the vendor's lien protecting the same. He did not release the lien himself. Now, in order for him to be bound by the release which the Atlas Company executed, one of two things must appear, first, that he expressly authorized the execution of such release, or, second, that his conduct in connection with the whole transaction, and particularly with reference to the bond purchasers, was such as to estop him from denying the validity of the release.

First, as to express authorization for execution of the release. Alex Meyers emphatically denies that he gave such authority to anybody. It is nowhere claimed that Colonel Gillie who executed the release as president of the Atlas Company had any instructions from Meyers to execute the release, but J. D. Foster, Jr., secretary-treasurer of the Atlas Company, testified that in a conversation with Meyers the latter instructed him (Foster) to deliver the notes and a release to the Trust Company. His testimony is somewhat confusing as to whether he means to say that Meyers, in that conversation, directed the execution of a release. In his direct examination he seems to say that Meyers did so direct him, but on cross-examination, he says that Meyers directed him to *deliver* to the Trust Company a release of the vendor's lien. There is no other testimony the question of specific authority. The extreme informality of the situation arrests immediate attention. The fact that a corporate assignor of vendor's lien notes should undertake to execute a release of the lien protecting such notes on the basis of a mere verbal statement to one of the officers of such corporation invites close consideration, and especially is this true when the particular officer in question is not sufficiently clear in his testimony to make it unequivocal as to whether the authority which he claims was given him was for the execution of a release by his company, or merely for the delivery of a release by his company. And then, this situation must be further considered in the light of the inconsistency between paragraph nine of the answer of the Atlas Mortgage and Finance Company, sworn to by J. D. Foster, Jr., as treasurer of the said company, and a substitute for said paragraph which

the trial court permitted the Atlas Company to make after some of the testimony now appearing in the record had been taken. The said paragraph nine as it appears in the original answer, reads:

"Your respondent further answering says that a few days thereafter the said Alex Meyers called upon the said Mr. Foster at the offices of this respondent, and asked to be advised the amount of credit he would receive on his note, and he was advised by Mr. Foster that he was entitled to the credit of Two Hundred Sixty ($260.00) Dollars. Thereupon the said Alex Meyers again directed the said Mr. Foster to receive from the Central Trust Company the amount of money necessary to pay off the said three (3) notes secured by the said vendor's lien, which were held by the said Atlas Mortgage Finance & Company as collateral security for the said Eight Thousand ($8,000.00) Dollar note."

The amendment which was allowed by the court on motion of the Atlas Company went to the last sentence of said paragraph. And the same as re-stated reads:

"Thereupon the said Alex Meyers again directed the said Mr. Foster to deliver to the Central Trust Company, the said (3) notes secured by vendor's lien, together with a release of said vendor's lien, securing same, as also the said collateral note for $8,000.00, upon the payment to said Atlas Mortgage & Finance Company by said Central Trust Company of the sum of $7,740.00."

The said change was permitted to be made on the ground that the first statement was a mistake.

To deprive Alex Meyers of the benefit of his lien on the basis of an authorization by him to his assignor to release said lien the proof of such authorization must be clear and satisfactory. We cannot say, from the evidence, that it does clearly and satisfactorily appear that he gave such authorization. Insofar as the finding of the commissioner in chancery and of the circuit court was predicated on any supposed express authorization of Alex Meyers to the Atlas Company

to release the vendor's lien, said action was without sufficient evidence to support it.

Now as to the alleged estoppel. Was the conduct of Alex Meyers such as to make it inequitable for him now to deny the validity of the release? From the time of the organization of the Washington Heights Land Company he rendered it financial assistance. He loaned it money, he endorsed its paper. In fact he loaned his brother, Samuel, $5,000.00 of the initial $9,000.00 that was paid in cash when the property was acquired by the Land Company. Alex was not a stockholder nor officer in the company. He says that he desired to assist his brother. Alex was conversant with the affairs of the company. He knew that a bond issue was being promulgated, and that the plan involved the application of a part of the proceeds received from the sale of bonds for liquidation of all the vendor's lien notes, and thereby give to the bond purchasers a first lien on the property.

The burden of the testimony in support of the estoppel is that Alex Meyers was fully conversant with the plan for the company to issue bonds secured by a deed of trust which should constitute the first lien on the property; that he discussed this matter with some of the persons who were contemplating the purchase of bonds and who did actually become such purchasers; that in such conversation he stated, in substance and effect, if not in exact terms, that he had loaned to the Washington Heights Land Company about $8,300.00 to take up vendors lien notes; that in no instance, either before the bonds were sold or for many months thereafter, did he intimate that he claimed the benefit of a lien in preference to the bondholders; that he received the benefit of proceeds of the bond issue to the extent of several thousand dollars which he had loaned to the company or for which he was responsible as endorser for the company. Further, it is undisputed that incidental to his purchase of the three vendor's lien notes aforesaid, Alex Meyers received of the Washington Heights Land Company a note for the sum of $8,332.50 endorsed by J. H. Henning, being the exact amount of the cash which Alex Meyers paid in part of the consideration passing from him to the Atlas Company for the said lien

notes, and there is evidence tending to show that Meyers received from the Land Company certain payments of interest on this note. Whether Alex received this note at the time of the purchase of the vendor's lien notes, or not until later, does not satisfactorily appear from the testimony. What is the explanation of this conduct, and what is its effect?

The note which he accepted of the Land Company was merely additional security for the amount which he had paid out in cash in part consideration of the vendor's lien notes which he had purchased. His acceptance of such note as additional security could in no wise operate as a waiver or release by him of the benefit of the vendor's lien to which he was entitled for the protection of the notes which he purchased. *Lambert* v. *Nicklass*, 45 W. Va. 527, 530.

The statements and conduct of Meyers as above outlined, relied on by the bondholders to establish an estoppel against him, cannot be said to be entirely unequivocal, but they must be considered and weighed in the light of the whole circumstances. It must be remembered that it was the plan, undisputed in the record and apparently understood by everybody concerned, that the vendor's lien notes were all to be discharged from the proceeds of sale of bonds and the bondholders thereby given a first lien on the property. Certainly nobody contemplated that Alex Meyers was to be paid out of the proceeds from the sale of bonds only about one-half of the amount which he had paid for the lien notes and was to be left on the basis of a mere common creditor as to the other half of the purchase price of said notes. It is admitted in testimony by J. H. Henning, president of the Washington Heights Land Company, that early in the year 1924, probably in the month of January, he had a conversation with Alex Meyers, and that he then told Meyers that they needed about $2,200.00 to complete the transaction (meaning the taking up of the vendor's lien notes and the promulgation of the bond issue), and that it was the recollection of witness that Meyers directly or indirectly furnished the money. Then followed this question by Meyers' counsel: ''Did he do that under the impression that by furnishing that $2,200.00 the company would be able to retire the entire $66,000.00 vendor's

lien notes?'' Answer. ''Yes.'' Thus was Meyers lulled into a state of security. Nor does it appear that Henning in making the said statement to Meyers intended to mislead him. Henning undoubtedly expected that all of the vendor's lien notes would be discharged. The trouble arose later. When counsel for the Trust Company examined the public records and found the assignments of the three vendor's lien notes to the Atlas Mortgage and Finance Company, he assumed that that company had continued in the ownership of said notes, when as a matter of fact it had sold them to Alex Meyers, as hereinabove recited. Thereupon counsel, not knowing that Alex Meyers had purchased the notes, prepared the release of the vendor's lien which was executed by Colonel Gillie for the Atlas Company. In the testimony of Russell Quarrier there appears the following question and answer: Q. ''In other words you conveyed to him (Alex Meyers) the impression that the vendor's lien transaction had been entirely cleared up?'' A. ''I told him I paid all of the vendor's lien notes and taken them up and got releases.'' Mr. Quarrier thought he had taken up all of the notes, and, of course, did not mean to mislead Mr. Meyers, but that Meyers was thereby led into a state of false security cannot be gainsaid. It was not until later that Meyers ascertained that he was short a large amount of money. Only after numerous conferences with Mr. Quarrier and Edward Hess, cashier of The Bank of Commerce, and counsel had been employed to assist him, was Mr. Meyers able to determine just what was the trouble.

Who should lose this money, Alex Meyers or the bond-holders? The record does not disclose that through word or action he purposely mislead any of them. Anything he may have said or done which may not seem to be entirely consistent with his present position may be readily explained in the light of the then existing circumstances. And another fact should be noted. More than $50,000 of bonds were purchased before the Atlas Company undertook to execute the release of the vendor's lien on the 25th day of February, 1924, and a much larger amount (not satisfactorily appearing from the record) was purchased before the said release was placed of record, the 4th day of March, 1925. Certainly all persons

who bought bonds prior to the recordation of the release made their purchases not only with constructive notice of the existence of the lien, as disclosed by the recorded deed, but of the rights of any assignees of notes secured by such lien. The unreleased lien was sufficient to put the bond purchasers upon full inquiry. *Diehl* v. *Construction Co.*, 72 W. Va. 74.

We therefore are impelled to the conclusion that Alex Meyers is not estopped by his conduct from now asserting the vendor's lien for the benefit of the amount due him on the three vendor's lien notes hereinabove mentioned and discussed. Nor is he estopped from denying the legality and binding effect of the release which was executed by the Atlas Mortgage and Finance Company. The said release should be set aside and cancelled and Meyers permitted to enforce the vendor's lien.

Now as to the claim of the Daily Gazette Company. On the 14th day of September, 1925, that company recovered judgment in the circuit court of Kanawha County against the Washington Heights Land Company for the sum of $640.71, with interest and costs. On the same date Samuel H. Meyers, owner of a little less than fifty *per centum* of the capital stock of the Washington Heights Land Company, filed his bill in chancery in the said court alleging the insolvency of said company, and praying that the assets of said company be marshalled and sold under proper decrees of court; that the affairs of said corporation be wound up, and the said corporation dissolved; that officers of the company be restrained from disposing of or encumbering the assets of the company; that creditors be enjoined from further prosecuting suits against said company or from in any manner interfering with the company's assets; and that a special receiver be appointed to take charge of the assets of the company and preserve the same under the court's direction until further order of the court. On the 18th day of said month, the court appointed the Central Trust Company special receiver of the assets of said Land Company with direction to take possession of said property and protect and care for the same until further order of the court. Also, by the said order all creditors were restrained from prosecuting any suits at law or in

equity against said land company and from in any manner attempting to obtain liens against any of the said company's assets or of subjecting the same to the payment of indebtedness, "save and except as this court may order and direct herein and as may otherwise be provided by law." On the 15th day of October, following, an execution was issued on the Gazette judgment. The execution was placed in the hands of the sheriff but was never levied on the assets of the defendant. It was promptly recorded in the office of the clerk of the county court as provided by statute. Pursuant of an order of reference entered by the court in the following month of March, the commissioner in chancery reported the assets and liabilities of the Washington Heights Land Company. He disallowed the claim of the Gazette Company as an execution lien. The court overruled the exception of the Gazette Company to said finding of the commissioner, and sustained the commissioner. The Gazette Company appealed. The bondholders resist the asserted lien and say that it cannot be given effect because the execution was issued subsequent to the awarding of the injunction which inhibited just that sort of thing, and, further, that the execution lien could not attach to the prejudice of other creditors subsequent to the appointment of the special receiver.

The Gazette Company says that it was verbally authorized by the judge of the circuit court of Kanawha County, soon after the awarding of the injunction, to cause execution to be issued on its said judgment, and therefore that it not only did not violate the terms of the injunction and thereby become guilty of contempt of court, but that its said action thus having been authorized by the judge, it is entitled to the benefit of the lien of the execution. In fact, on motion of the Gazette Company, the circuit court entered an order on the 17th day of March, 1928, reciting that subsequent to the entry of said injunction decree of September 18, 1925, "this court gave verbal permission to said Daily Gazette Company and its counsel in this cause to issue execution on its judgment against said debtor company recovered in this court September 14, 1925, provided, however, that the same should not be levied upon the assets of said debtor company while

in the hands of said receiver, or the said receiver embarrassed in his possession of same''; and further declaring that the said Gazette Company did not act in violation of the said injunction.

The said verbal authorization of the judge of the court may have been sufficient to protect the Gazette Company from contempt of court, but it was not sufficient to place the said creditor in a position where the execution on its judgment would operate as a lien to the prejudice of other creditors. For sufficient cause, and by formal order, the court might have made an exception of the Gazette Company, but it did not do so in efficacious manner. Courts of record can speak only through their records. Code, Chapter 114, section 4; *Trust Co. v. Todd*, 101 W. Va. 31.

But was the injunction valid in any event? The decree required no injunction bond and none was given. Nor did the decree contain any recital to the effect that in the opinion of the court it was a case in which it was proper for an injunction to issue without bond. The decree was wholly silent on the question of bond. Section 10, Chapter 133 of the Code, requires that bond be given conditioned as therein prescribed before an injunction order shall become effective, ''except in the case of any personal representative, or other person from whom, in the opinion of the court or judge, awarding the same, it may be improper to require bond * * *.'' The statute is explicit. An injunction shall not take effect until bond be given in such penalty as the court or judge awarding it may direct, except as provided. Our cases recognize and enforce the mandate of the statute. *State* v. *Marguerite Coal Co.*, 104 W. Va. 324; *Conley* v. *Brewer*, 85 W. Va. 725; *State* v. *Johnson*, 28 W. Va. 56. The intent and purpose of the statute is manifest, namely, that he who invokes the injunctive process of the court must be proper bond guarantee to make good to any person whose rights are prejudicially affected by such injunction all damages and injuries thus occasioned to him. Why should Samuel Meyers have been permitted in this case to tie the hands of creditors without proper bond as contemplated by the statute? If there was reason therefor, it should have been recited in the order. Again we say courts

644

of record must speak by their records. The court's record containing no reason why the injunction should have been issued without bond, it must be considered that there was no reason. Therefore, the granting of the injunction in such manner was erroneous. Not only that, but the injunction was without binding force. The statute so says. There was therefore no legal or binding injunctive inhibition on the Gazette Company against its causing an execution to be issued on its judgment subsequent to the entry of the injunctive decree.

But the bondholders say that the appointment of the receiver in itself operated to preclude the Gazette Company from causing an execution to be issued, and thereby create a lien on the personal assets of the debtor. Some receiverships have that effect. This is true when a corporation has been adjudged insolvent, and a receiver is appointed to wind up its affairs, administer its property and distribute the proceeds among creditors and stockholders, but receiverships which do not involve complete administration of the assets of the debtor do not operate to stay the hands of creditors who seek to establish liens against such assets. *West Virginia Utilities Co.* v. *Dura Glass Mfg. Co.*, 99 W. Va. 193, and authorities there cited.

In this case, the injunctive order being inoperative, what effect did the appointment of the receiver have against the rights of the Gazette Company to issue an execution on its judgment? As already noted, the prayer of the bill is for a winding up of the affairs of the Land Company and dissolution of its corporate entity. The receivership, however, was restricted in its scope. The receiver was directed to take possession and control of all of the property and assets of the Land Company; to care for and preserve said property; to institute such actions at law or suits in equity as may be necessary for such possession; and to employ such agents, attorneys or other persons as may be necessary and proper for the effective control, protection and maintenance or disposition of said property, all until further order of the court. The effect and purpose of this receivership was to hold intact the assets of the debtor. We must look to the decree of the

court and not to the prayer of the bill. It is to be noted that the receivership was not for the complete administration of the assets of the corporation. The court authorized the receiver to conserve the assets, not to administer them. The purposes of the receivership were limited; it was not tantamount to a dissolution. There was therefore no restriction on the Gazette Company's rights to perfect its execution lien. 34 Cyc., 199, 221. The commissioner should have allowed the Gazette Company's lien as asserted by it. The court erroneously overruled the Gazette Company's exceptions to the commissioner's report.

For the foregoing reasons, the decree of the circuit court is reversed, as to both the claim of Alex Meyers and the claim of the Daily Gazette Company, and the cause is remanded for further proceedings in accordance herewith.

*Reversed and remanded.*