McDaniel Purcell, *Trustee, etc. v.* Frank W. Robertson *et al.*

(No. 9053)

Submitted April 9, 1940.   Decided May 7, 1940.

*Okey P. Keadle* and *McDaniel Purcell,* for appellant.
*Campbell & McNeer* and *George I. Neal,* for appellees.

MAXWELL, JUDGE:

The question here for decision is whether there was lawful release of two judgments which had been obtained in favor of a trust estate. On final hearing on the merits, the bill of the trustee, challenging the releases and seeking their cancellation, was dismissed by the trial court. The trustee prosecutes this appeal.

The plaintiff, McDaniel Purcell, is trustee of an estate in trust created by the last will of Gerard C. Ricketts, deceased. Purcell succeeded John G. Ricketts who had succeeded the original trustee, Ella R. Wiley.

Under date of May 15, 1925, a certain lot of land, situated at the southwest corner of Eighth Avenue and First Street in the City of Huntington and constituting part of the trust estate, was leased for a term of ten years by Wiley, trustee, to George I. Neal, who soon assigned the lease to Frank W. Robertson and Vickers B. Watts. The two last-named are the principal defendants.

In 1932 John G. Ricketts, having become trustee the preceding year, obtained for the benefit of the trust estate a judgment for $1143.35 against Robertson and Watts for unpaid rent under the lease. Again, in 1936, the same trustee, likewise for the benefit of the estate on account of unpaid rent, obtained a judgment against Robertson and Watts for $4245.30. Later that year, Ricketts, trustee, executed a separate release for each judgment. In the fall of 1938, Ricketts resigned as trustee and was succeeded by the plaintiff who, at an early date thereafter, instituted this suit.

According to the testimony of Vickers Watts and his father, Hans Watts, the releases were the result of an arrangement made in 1932 between Ricketts, trustee, and the elder Watts who is an experienced realtor of the City of Huntington. They testified that this arrangement was that the trustee would release the judgment which had then been taken, and subsequent liability on account of the rent, in consideration of efforts of Hans Watts to procure the location of a street underpassage of the Chesapeake and Ohio Railway tracks at First Street, close by the lot above mentioned, and that he would relinquish his right to brokerage commission on any sale he might be able to make of the lot or a part thereof. John Ricketts in his testimony denied that there was any such arrangement, and asserted that the matter of release of the judgments was first mentioned by Hans Watts at the time the sale in the summer of 1936, stated below, was about to be consummated. In June or July, 1936, the underpass having been located as desired by Hans Watts, he effected sale of somewhat less than a moiety of the lot for $5,000.00 cash. Customary commission of five per centum of the sale price, was waived by the broker, and soon after the purchase money had been paid and the deed delivered the releases as stated were executed and delivered.

John Ricketts testified that he released the judgments in consideration of the waiver of $250.00 commission by Hans Watts because he (Ricketts) believed the judgments to be unenforceable. It is a concessum that the judgment debtor Vickers Watts, was without property or means wherefrom the judgments or an appreciable part thereof could be discharged. And certain it is that both Hans Watts and the judgment debtor, Robertson, exerted themselves to impress Ricketts, trustee, that Robertson's property holdings, consisting mainly of corporate stocks, were of such inconsequential value that nothing could be realized therefrom to apply on the judgments if effort were made to enforce the same by execution or otherwise. Ricketts may have been unduly credulous but the fact remains that, in consequence of the impression cre-

ated on his mind by the statements of these men, he committed an indiscretion seriously prejudicial to the trust estate of which he was in charge. Though he were gullible to a fault, the trust estate should not thereby be made to suffer, to the unwarranted enrichment of others.

From the testimony respecting Robertson's holdings it appears that in the era of severe depression as typified in 1932, and probably for a period thereafter his financial condition was extremely precarious, and likely a judgment in substantial amount could not then have been enforced against him. But in 1935 and 1936 his financial status had so greatly improved that certainly in the latter year the debts represented by the judgments could have been enforced against him. However, it is the contention herein of Robertson and Vickers Watts that the issue must be appraised in consonance of the situation as it appeared in 1932 (date of alleged understanding referred to above), and that the execution and delivery of the releases in 1936 should not be viewed in the light of the improved conditions then existing.

The overshadowing and controlling fact is that John Ricketts was not dealing with his own personal matters. If so, he could have taken a sporting chance—a long shot —in 1932, and, for small consideration which might later materialize, have agreed to release judgments of substantial amount. That would have been his own affair. But such was not the case. He was acting in a fiduciary capacity and was dealing with property not his own, and that fact was well known to Hans Watts and the defendants, Robertson and Vickers Watts.

Hans Watts is not a party to this suit, but he had much connection with the matters involved. There is no contradiction of the testimony of John Ricketts that while he was acting as trustee he was told by Hans Watts that the judgments against his son, Vickers Watts, and Robertson were "no good". The record discloses that this statement was not warranted respecting the situation which existed in 1936.

Following the judgment in 1932, Ricketts, Trustee, and

his attorneys frequently discussed the matter with the debtors in an effort to obtain payment. A proceeding was initiated to subject Robertson and Vickers Watts to examination before a commissioner in chancery under the authority of Code, 38-5-1, which prescribes a procedure in aid of execution. Summons was issued but the effort was abandoned because of the insistence of Robertson that nothing would be revealed to establish his ability to pay. Repeatedly he asserted that he did not have anything with which to pay. Such was his attitude even as late as 1936, after the second judgment had been taken.

In order that the plaintiff may have cancellation of the releases under attack it is not necessary that Robertson be convicted of actual or positive fraud. If he was guilty of legal or constructive fraud in procuring the releases they should be set aside on that ground. Specific intent to act deceitfully and thereby perpetrate a fraud is thus eliminated. He seems to have entertained the belief that because he did not have ready cash, he was unable to respond to the judgments. Typical of this attitude is his testimony that because his share of net income from the contracting corporation of Sammons-Robertson Company was not withdrawn in cash but was left in the business, the amounts thus earned were not available to him to apply on his indebtedness to the Ricketts trust estate. That, of course, is not sound reasoning. His share of the net earnings of this company was his personal asset whether withdrawn, or employed for augmentation of the business enterprise wherein they were earned. But, though he may have believed to be true his reiterations of inability to pay, when as a matter of fact the statements were not true, certainly in 1936 and probably in 1935—these representations having been influential on the mind of Ricketts, trustee, in his execution of the releases— the conduct of Robertson constituted a legal fraud. Such, we are of opinion is the result necessarily to be reached; and we so hold. "A representation, untrue in fact, made by one party to a contract, as of his own knowledge, which induces the other party to enter into the contract, whereas,

the first party was uninformed as to the truth or falsity of the representation, is fraudulent in equity, even in the absence of actual fraudulent intent." Pt. 6, Syl., *Gall* v. *Cowell*, 118 W. Va. 263, 190 S. E. 130, 131. In a pertinent general observation on this subject there is this succinct statement: "It (constructive fraud) is presumed from the relation of the parties to a transaction or from the circumstances under which it takes place. The conscience is not necessarily affected by it. Indeed, it has been said that it generally involves a mere mistake of fact. Hence, the terms 'constructive fraud' and 'legal fraud' both connote that in certain circumstances, one may be charged with the consequences of his words and acts, as though he has spoken or acted fraudulently, although, properly speaking, his conduct does not merit this approbrium." 23 Am. Jur., p. 756.

In consequence of the foregoing conclusion the finding of the trial chancellor that there was no fraud is disapproved. While an appellate court is reluctant to disturb a finding of fact of a trial court on conflicting evidence, such finding "will be reversed where it clearly appears to be against the weight and preponderance of the evidence." *Blue* v. *Glass Co.*, 106 W. Va. 642, 147 S. E. 22. Consult: *Meyers* v. *Land Co.*, 107 W. Va. 632, 149 S. E. 819; *Harner* v. *Harner*, 115 W. Va. 457, 177 S. E. 286.

In the argument, both oral and written, there was insistence on behalf of the plaintiff that the execution by the trustee of the releases was a matter which required the sanction of a court of chancery as a condition precedent. This position is grounded on Code, 44-5-7, whereof the provision invoked reads: "It shall be lawful for any guardian, committee, or trustee, to compound and compromise any liability due to or from him, provided that such compounding and compromise be ratified and approved by a court of equity of competent jurisdiction, all parties in interest being before such court by proper process. When such compounding and compromise shall have been so ratified and approved, it shall be binding on all parties in interest before such court."

The cited section first appeared in our statutes in the Revised Code of 1931. When the quoted provision was thus engrafted, general law permitted trustees to make *bona fide* settlements of matters under their control. Where it is reasonably prudent to compromise a claim, a trustee has general authority to do so. 2 Scott on Trusts, section 192; 3 Bogert on Trust and Trustees, section 592. The above quoted statutory language does not place an inhibition on the broad authority of trustees to settle claims. It neither enlarges nor reduces authority in such matters. The principal purpose and effect of the new provision is to afford protection to a guardian, committee or trustee who obtains the sanction and approval of a court of chancery respecting a settlement or compromise entered upon by him. When approval has thus been obtained the fiduciary stands clear; without such approval his action remains open for challenge. So, we do not sustain the position of the plaintiff on this feature of the case.

For the reasons herein first above set forth, we reverse the decree of the trial chancellor and remand the cause for further proceedings not at variance with the principles herein stated.

*Reversed and remanded.*