553 F.2d 329
 Joseph M. BOSTIC, Appellee,
v.
AMOCO OIL COMPANY, Appellee,
v.
Roy D. BOWIE and Lois P. Bowie, Appellees,
and
Sun Oil Company of Pennsylvania, a corporation, Appellant.
Joseph M. BOSTIC, Appellant,
v.
AMOCO OIL COMPANY, Appellee,
v.
Roy D. BOWIE et al., Defendants.
 Nos. 76-1265, 76-1266.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 10, 1976.
Decided March 18, 1977.
 
 Amos A. Bolen, Lewisburg, W. Va., for Joseph M. Bostic.
 Edward W. Eardley, Charleston, W. Va. (Steptoe & Johnson, Charleston, W. Va., on brief), for Sun Oil Co.
 W. H. File, Jr., Beckley, W. Va., (File, Payne, Scherer & Brown, Beckley, W. Va., on brief), for Amoco Oil Co.
 Louis George, Huntington, W. Va., for Roy D. and Lois Bowie.
 Before BRYAN and FIELD, Senior Circuit Judges, and WINTER, Circuit Judge.
 ALBERT V. BRYAN, Senior Circuit Judge:
 
 
 1
 This is an action by Joseph M. Bostic to recover damages of the American Oil Company for alleged constructive fraud in not conveying to him a lot of land in Greenbrier County, West Virginia according to the agreement of sale between them but, instead, deeding to him a lot adjoining the lot upon which Bostic had built as contemplated in his purchase. With a jury waived, the District Court held the conveyance to Bostic to be the result of mutual mistake and not ascribable to the fraud of Amoco. It authorized rescission of the sale, but denied him damages. Bostic appeals (No. 76-1266).
 
 
 2
 In a third-party complaint Amoco named as defendants Roy D. and Lois P. Bowie (the Bowies), owners of the intended lot, and their lessee, Sun Oil Company. It charged them with actionable conduct in failing to warn Bostic of his mistake in building upon the wrong land and charged, further, that they were obligated either to buy the building at its fair market value or to sell the lot to Bostic at its unimproved fair market value. Bostic filed a similar complaint against the Bowies and Sun. In responsive pleadings, the third-party defendants denied any liability to Amoco and Bostic; they also counterclaimed for trespass by Bostic, and Sun cross-claimed to suspend its liability to the Bowies for rent. The Court held groundless these fraud claims as well as the trespass counterclaim, with the right in Bostic to remove the improvements, and ordered Sun to continue the lease payments. Sun appeals (No. 76-1265).
 
 
 3
 Despite its repetition, a close narration of the evidence is essential here. In February 1973 appellant Bostic took over a Texaco station on U.S. Route 60, three or four miles west of White Sulphur Springs, West Virginia. Operation of the filling station with incidental mechanical work looked more promising when United Parcel Service (UPS) indicated a desire to have Bostic maintain its 10-truck fleet in that area. As his existing facilities were limited, in the summer of 1973 Bostic became interested in acquiring the vacant lot adjacent to and immediately east of "next to" his Texaco station for construction of a garage with repair shop and a UPS depot. A "For Sale" sign had been posted on this lot for many months.
 
 
 4
 Encouraged by the availability of a Small Business Administration loan from a local bank, Bostic telephoned one Pharoah in Baltimore, Maryland about the lot, as directed by the "For Sale" notice. Replying, Pharoah advised Bostic that he represented Amoco and offered to send him a topographic map of the property. In a few days, the map (the plat) arrived with a letter which described the property as ". . . the land next to the Texaco station . . .." While the loan was in process, Bostic obtained a valuation of the property from a local appraiser, Andrew McLaughlin, and thereafter inquired of Pharoah whether Amoco would accept the appraisal figure of $22,500. Pursuant to Pharoah's instructions, Bostic, who on the bank's initiation had obtained the services of attorney Ralph Keightley, asked the lawyer to prepare a 90-day option agreement to buy from Amoco at this price.
 
 
 5
 The agreement was subsequently forwarded to Pharoah with a $500 down payment together with McLaughlin's report, the latter reciting that it covered ". . . the lot joining Texaco Station on Rt. 60 . . . ." Executed in due course by an Amoco official, this agreement described the subject property as ". . . containing 0.50 acres, more or less, adjoining the property owned on the west by Texas Oil Company . . . ." The option was exercised by Bostic and the transaction was concluded in February 1974 with money from the bank loan. Thereafter Bostic went forward with erection of the proposed improvements on the lot next to the Texaco station.
 
 
 6
 In August 1974, when all improvements had been completed, or obligated for, it was discovered through statements of Sun representatives that, in fact, Amoco had conveyed to Bostic a lot immediately east of the intended lot, the latter, as heretofore explained, being next to the Texaco station. A sketch of the lots in suit, with their relative positions, follows:
 
 
 7
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEBostic thus was faced with the problem of having built on a lot, owned by Roy D. Bowie and his wife, and by them leased to the Sun Oil Company, and located between the Texaco station and the deeded lot. Thereupon disbursements of the bank loan were stopped, leaving Bostic with outstanding building debts in excess of $28,000, plus the obligation of the loan, as well as a debt of $17,000 for acquisition of miscellaneous business equipment. Bostic since has lost the arrangement with UPS because he could not provide it a lease. The cost of moving the Bostic buildings from the Bowie or intended lot rendered this alternative impracticable, just as was the possibility of Bostic's purchase of the Bowies' lot they were asking $70,000 to $80,000 for it, more than three times the Amoco-Bostic price.
 
 I.
 
 8
 In our judgment the decision of the District Court is erroneous in rejecting Bostic's action for damages and declaring his only remedy was rescission for a mutual mistake of fact. This was not, as Amoco asserts, a finding of fact reversible only if "clearly erroneous"; rather it was an incorrect conclusion of law upon uncontroverted facts. For this reason the judgment must be vacated.
 
 
 9
 To us the injury to Bostic was the direct and proximate consequence of fraud in the vendor's misrepresenting the situs of the land as agreed upon. While the evidence disclosed no deliberate deceit, Bostic plainly proved a fraud in actuality.
 
 
 10
 The law of fraud in West Virginia is set out in Horton v. Tyree, 104 W.Va. 238, 139 S.E. 737 (1927):
 
 
 11
 "(O)ne to whom a representation has been made as an inducement to enter into a contract has the right to rely upon it as true quoad the maker and need make no further inquiry. If he does so rely upon it, and it turns out to be untrue, and he is injured thereby, the party making the representation is liable for the damages, which may be recovered in an action of deceit. . . . Whether the defendant made the statement imputed to him, knowing it to be materially untrue, and for the fraudulent purpose of deceiving the plaintiff as charged in the declaration, we need not inquire, for it is not, in order to maintain this action, indispensable that the defendant be shown to have known the statement was false. For it is elementary doctrine that a false representation may be made scienter, so as to afford a right of action in damages, in contemplation of law, in any of the following ways: (1) With actual knowledge of its falsity; (2) without knowledge either of its truth or falsity; or (3) under circumstances in which the person making it ought to have known if he did not know of its falsity. . . ." (Citations omitted) (Accent added.)
 
 
 12
 See Purcell v. Robertson, 122 W.Va. 287, 8 S.E.2d 881 (1940).
 
 
 13
 In circumstances such as those of the instant case, where the impetus for the misrepresentation is a mistake of fact by the party making the representation, the resulting tort is labeled "constructive" fraud. See Purcell v. Robertson, supra; Atkinson v. Jones, 110 W.Va. 463, 158 S.E. 650 (1931).
 
 
 14
 That Bostic intended to buy, and Amoco agreed to sell to him, only the lot immediately to the east of and "next" to his Texaco station is repeatedly and emphatically manifested in the negotiations for and consummation of the sale. At the risk of repetition, the steps thereof and the developments in each must be set out chronologically.
 
 
 15
 1. Bostic testified that in 1973 there was a "For Sale" sign on the intended lot bearing the name, the Maryland address, and the telephone number of one H. A. Pharoah. By coincidence, Bostic had observed a man place the sign on the lot during the summer of 1972, before he began operation of the Texaco station. Bostic's place of business, the Texaco station, adjoined the intended lot and he saw the sign daily.
 
 
 16
 His testimony was corroborated by Charles Collison, an employee of the station, who also witnessed the man place the sign on the lot in the summer of 1972 "about 10 feet east of the Texaco lot and then it was several feet off the paved highway", U.S. Route 60. Collison stated that he knew where the Texaco station line was located.
 
 
 17
 Bostic's testimony was also corroborated by McLaughlin, who had appraised the intended lot for Bostic early in 1973 after Bostic's initial contacts with Pharoah. While Pharoah's deposition, introduced at trial, indicated that he believed that in September 1972 the sign had been placed by him by staking it in a pile of dirt on the conveyed lot, he had not previously, nor since, seen the lot until he came to West Virginia in 1975 to be deposed.
 
 
 18
 2. In any event, as mentioned, during the summer of 1973 Bostic called Pharoah at the telephone number on the sign and they discussed a purchase of the lot. As a result, an undated letter was written to Bostic by Pharoah saying:
 
 
 19
 "Confirming our telephone conversation of this date, regarding the land next to the Texaco station at the intersection of I-64 interchange and Rte 60, west of White Sulphur Springs, W.Va.
 
 
 20
 "Enclosed is a Topography survey of the property and we are asking $25,000 cash and net to Amoco Oil Co." (Accents added.)
 
 
 21
 Pharoah's letter was on stationery of American Oil Company in Baltimore and he signed as "Business Development Rep.".
 
 
 22
 3. The topographical survey (plat), dated December 29, 1969, showed a lot on the south side of Route 60 on the same side as the Texaco station with a frontage of almost 200 feet and an area of approximately 0.50 acre. These distances and content are nearly identical with those of the intended lot next to the Texaco station. The plat does not describe its property as adjoining on the west Texaco's, but indicates the property on the west as "Dr. Roy D. Bowie Leased to Sun Oil Co. Bk. 248 PG 82 & 249, PG 423". However, the legend just quoted did not show who was the owner or lessee of the land adjacent to the platted lot in 1973 four years after the date of the plat when Bostic took over the Texaco station.
 
 
 23
 4. McLaughlin's appraisal sent to Amoco supporting Bostic's offer of $22,500, described the property as "the lot joining Texaco Station on Rt. 60 ". McLaughlin was later employed by Amoco as an appraiser, thus avouching him.
 
 
 24
 5. As a means of proposing the lower figure to Amoco, Pharoah suggested that he or Bostic have an option with a price of $22,500 prepared for submission to Amoco. Pursuant to bank and SBA policy to assure title, draft the deed, and take care of the loan papers, the bank required a lawyer and with Bostic's approval selected Ralph Keightley, a local practitioner.
 
 
 25
 6. Bostic took the option data to Keightley and later received the option paper from him. The lot was therein described by following the metes and bounds shown on the plat sent to Bostic by Pharoah. The option was returned to Bostic signed by J. R. Wilson, "Its Manager Capital Investment" of Amoco, on October 8, 1973. The document had been executed by Bostic on September 19, 1973. The letter of transmittal to Amoco included a check of $500.00 for deposit "on said property of option ".
 
 
 26
 7. The "property of option" as taken verbatim from that paper is:
 
 
 27
 "(a)ll of that certain tract or parcel of real estate situate on the south side of U.S. Route No. 60, in White Sulphur District, Greenbrier County, West Virginia, containing 0.50 acre more or less, adjoining the property on the west owned by Texas Oil Company and on the east by Greenbrier Commercial Developments, Corp. reference here being made to the records in the office of the Clerk of the County Court of Greenbrier County, West Virginia". (Accent added.)
 
 
 28
 That line on the east is taken from the plat, defining the eastern boundary of the platted property, the lot actually conveyed. This line would in fact be 400 feet, more or less, measured along Route 60 from the line of the Texaco station. Thus the description in the option actually embraces both the intended lot the land originally priced at $25,000 which Bostic sought to acquire for $22,500 and the conveyed lot. So construed, the option would appear to bind Amoco to sell all the land between the Texaco lot and the Greenbrier properties.
 
 
 29
 Nevertheless, Amoco bound itself to give Bostic a "general warranty deed conveying the herein described property", thus further evidencing Amoco's agreement to sell what it had caused Bostic to believe was the intended lot, i. e., the one next to the Texaco station. These conclusions are not modified by the reference in the description to the land records, because all lands have this source point.
 
 
 30
 8. Pharoah, when asked about the lot during Bostic's initial telephone call, responded not only that it adjoined the Texaco station, but also that the property line was marked by a three-quarter inch iron pipe and that 200 feet up the road there was an iron peg, an inch and a quarter in diameter. Pharoah did not deny this explanation, saying only "I doubt that I would have told him that." Bostic found two such markers, as well as one at each of the two rear corners of the intended lot, exactly where Pharoah assured him they would be. Subsequently, Bostic explained to McLaughlin, the appraiser, where to find the corner stakes and gave him the letter from Pharoah describing the lot. McLaughlin, as heretofore mentioned, described the lot in his appraisal on the basis of these directions as "joining Texaco Station on Rt. 60".
 
 
 31
 9. The option was "exercised" by Bostic by letter of November 27, 1973 (apparently written for him by Keightley) referring to the option agreement, which had described the land as "next to the Texaco Station". The letter does expand this description by adverting to the land as it appears on the plat's caption, that is, land acquired by Amoco from the Bowies, with appropriate deed book references. The land within the expanded notation was not the intended lot. However, this would not necessarily have alerted Bostic or Keightley to a discrepancy, because Amoco throughout had caused Bostic to associate the intended lot exclusively and precisely with the description of the lot shown in the map.
 
 
 32
 10. Neither the deed dated January 21, 1974, conveying a lot from Amoco to Bostic, nor the deeds of trust securing Bostic's bank loans, describe the lot as it was set forth in the option, i. e., as "adjoining the property on the west owned by the Texas Oil Company." Instead, each deed gave courses and distances beginning at, and running from, the northeasterly corner of a property which had been leased by the Bowies to Sun Oil Company in 1968. These are identical to those appearing, both in the deed by which Amoco acquired the lot from the Bowies, and on the plat sent to Bostic by Pharoah. The deed thus described land represented by Amoco as embracing the intended lot but actually not doing so.
 
 Notice from Plat and Deed
 
 33
 Amoco contends, however, that the reference to the 1968 lease from the Bowies to Sun Oil put Bostic on notice that he could not rely upon prior representations that the plat-lot was the intended lot. In effect, Amoco asserts that the deed, accurately and clearly describing the lot it was conveying, was tendered by Amoco and was accepted by Bostic in fulfillment of the antecedent contract solely because of Bostic's inattention, and ergo, the deed thereupon merged the earlier wholly different contract into the deed.
 
 
 34
 The doctrine of merger was recited by the Supreme Court of Appeals and held applicable only in the "absence of a showing that the variance is due to fraud or mutual mistake." Syllabus by the Court in Watson-Loy Coal Co. v. Monroe Coal Mining Co., 85 W.Va. 645, 102 S.E. 485 (1920); see Richmond Homes, Inc. v. Lee-Mar, Inc., 20 Ohio App.2d 27, 251 N.E.2d 637 (1969); Everett v. Gilliland, 47 N.M. 269, 141 P.2d 326 (1943). Thus, instantly the rights of Bostic were not foreclosed by acceptance of the deed.
 
 
 35
 It is the law in West Virginia that, where a party charged with actual notice denies it, the burden of proof then shifts and the person who asserts that notice has been had must establish the facts and circumstances which clearly indicate notice. Alexander v. Andrews, 135 W.Va. 403, 64 S.E.2d 487 (1951). "(T)he fact of notice must be proved by indubitable evidence; either by direct evidence of the fact, or by proving other facts, from which it may be clearly inferred. It is not in such case sufficient that the inference is probable, it must be necessary and unquestionable. (Citation omitted.)" (Accent added.) Hupp v. Parkersburg Mill Co., 83 W.Va. 490, 98 S.E. 518, 520 (1919). This Amoco has not done.
 
 
 36
 Notice from Attorney's Examination of Title
 
 
 37
 The defense has been offered that the title search conducted by attorney Keightley did or should have disclosed to Bostic the misidentification of the lot that he intended to acquire "next to the Texaco station."
 
 
 38
 To begin with, seemingly Keightley was primarily the bank's rather than Bostic's, agent. The lender insisted upon engaging a lawyer and Bostic merely acted at its direction. Knowledge of the attorney would be imputed to the bank but not to Bostic.
 
 
 39
 Nevertheless, even if it be thought that notice to Keightley from the title search would be notice to Bostic, there was no such notice as would preclude his fraud claim. As will immediately appear from the exposition of a title run, there was nothing of record affecting the title to the tract the attorney was directed to trace that would point him to Amoco's misrepresentation. His examination would be confined to the Amoco property, looking only for a complete chain of ownership and any diversion thereof by mortgage, lease, judgment or taxes. Unless it touched the Amoco title, it would be discarded. The examination would not carry back notice to the examiner's principal of anything else of record.
 
 
 40
 In the title examination in question the abstractor, in looking to what recordations related to the lot on Amoco's plat, would see only these:
 
 
 41
 1) A deed conveying land from the Bowies to Texas Oil Company, dated February 29, 1968; that is, the Texaco lot to the west of and adjoining the intended lot.
 
 
 42
 2) A memorandum of lease of land from the Bowies to Sun Oil Company, dated August 16, 1968, which on inspection would be discarded as it did not include the lot under examination and shown on the plat.
 
 
 43
 3) An amendment to the Bowie-Sun Oil lease to correct the description of the leased lot, dated February 8, 1969.
 
 
 44
 4) A deed conveying land from the Bowies to the American (now Amoco) Oil Company, dated January 27, 1970, which was the lot shown on the plat.
 
 
 45
 The indices to land records contain no description of the land affected. On their face, neither the deed to the Texas Oil Company, nor the lease to the Sun Oil Company reflected the land deeded to the American Oil Company the land upon which the title search focused.
 
 
 46
 Amoco's defense principally is that Bostic undertook, and as a vendee was required, to look to the land records to ascertain whether the plat and the Amoco deed embodied the intended lot. However, this overstates the intendment of any direction by Bostic to Keightley as well as the duty, if any, owed by a purchaser to a fraudulent vendor. At most, Bostic undertook through Keightley to examine the title solely to the conveyed lot, and any duty incumbent upon him would extend no further. As already explained, such an examination would have not disclosed the instant disparity.
 
 
 47
 Moreover, the case upon which Amoco rests its contention, Shappirio v. Goldberg, 192 U.S. 232, 24 S.Ct. 259, 48 L.Ed. 419 (1904), does not put that obligation upon a vendee. There involved was a small lot in the District of Columbia. To the eye it included a small rectangular portion at the southwest corner of the entire lot. After the sale, the purchaser sued for fraud on the premise that the seller had represented that the small part was included within the purchase of the lot when in truth it was not. The Court held that the vendee was apprised of this fact by the description in the deed to the vendor which the vendor had given the purchaser before the contract of sale was executed by him.
 
 
 48
 It was in this context that the Court held that since a casual reading of the deed would have disclosed the boundaries of the lot, the purchaser was obligated to avail himself of such information as was at hand, and that having failed to do so he had no claim on the basis of fraud.
 
 
 49
 Another authority upon which Amoco relies is Farnsworth v. Duffner, 142 U.S. 43, 12 S.Ct. 164, 35 L.Ed. 931 (1891) arising in West Virginia. A grantee under a tax deed agreed to sell the large acreage therein to the plaintiff. The contract set out in detail the many exceptions and provisos in the sale, and conveyance was made accordingly. Some of the vendors had cautioned him against acquiring the property without careful legal advice because tax titles "polecat" or "wildcat" acquisitions are suspect. On plaintiff's suit for damages for fraud in the sale, the holding of the Court was that before consummating the transaction the purchaser had been aware of the serious doubts concerning the title to the contract upon which he based his claims of fraud. In these circumstances, the Court held that there could be no rescission for fraud.
 
 
 50
 But above all, the reason these two decisions are not precedents here is that in our case, unlike the facts in those cases, no examination of the title to the conveyed lot would disclose the mistake.
 
 
 51
 Furthermore, in Shappirio the Court recognizes that there are instances of actionable fraud in such agreements wherein the purchaser had not investigated for himself:
 
 
 52
 " * * * There are cases where misrepresentations are made which deceive the purchaser, in which it is no defense to say that had the plaintiff declined to believe the representations and investigated for himself he would not have been deceived. * * *" (192 U.S. at 241, 24 S.Ct. at 261).
 
 II.
 
 53
 Mistake, as the District Court held, of course entered into the transaction, but it was not mutual. The facts are not in controversy between Amoco and Bostic; the knowledge of them was wholly, if not exclusively, within Amoco. In these circumstances the victim is not limited in remedy to rescission, but is entitled to recover damages. We said so in Ford v. Buffalo Eagle Colliery Co., 122 F.2d 555, 561 (4 Cir. 1941):
 
 
 54
 "The controlling West Virginia rule on the question of fraud is stated in the syllabus prepared by the court in Horton v. Tyree, supra, 104 W.Va. 238, 139 S.E. 737: 'Where one person induces another to enter into a contract by false representations, which he is in a situation to know, and which it is his duty to know, are untrue, he, in contemplation of law, does know the statements to be untrue, and, consequently, they are held to be fraudulent, and the person injured has a remedy for the loss sustained by an action for damages. It is not indispensable to a recovery that the defendant actually knew them to be false.' " (Accent added.)
 
 Summary
 
 55
 The upshot of this case is that Amoco does not deny having fraudulently albeit innocently injured Bostic through its misrepresentations, but would defeat Bostic's recovery because he did not discover the misrepresentation. This defense cannot prevail.
 
 Remand and Orders Thereon
 
 56
 For the reasons stated, we set aside the judgment denying Bostic recovery of damages from Amoco, and remand this action with directions to the trial court to enter an order declaring Amoco liable to Bostic for damages for fraud, as claimed by him herein, and setting the action for a new trial on the issue of damages. Further, the trial court will vacate its orders upon the third-party complaints, counterclaims and cross-claims, and reconsider these determinations, equitably adjusting the liabilities, if any, and the relief grantable thereunder, while ascertaining the amount of the damages due and payable to Bostic from Amoco.*
 
 
 57
 Orders Vacated with Grant of New Trial.
 
 WINTER, Circuit Judge, dissenting:
 
 58
 Together with the district judge, I think that the conveyance to Bostic of land which he did not desire and which did not adjoin the lot that he owned was the result of mutual mistake and was not ascribable to the fault of Amoco. Since Bostic and his attorney were fully advised of what Amoco was selling, Bostic's own lack of understanding and the deficiencies of Bostic's attorney and title searcher brought about the result. I would affirm in all essential regards except to require Bostic to reimburse Sunoco for the rent it paid Dr. Bowie during the period of Bostic's continuing trespass on the property leased by Sunoco. From a contrary holding, I respectfully dissent.
 
 I.
 
 59
 The majority concedes that Amoco did not practice intentional fraud on Bostic. I wholeheartedly agree. But I disagree with the holding that Amoco made false representations to Bostic, thereby practicing constructive fraud which led him into his present predicament. Bostic and his attorney had ample notice of what Amoco was selling and what he was buying. That he was mistaken, or failed to grasp that which was called to his attention, is regrettable, but it serves as no basis for recovery from Amoco although it may well support a claim against his attorney.
 
 
 60
 My conclusions stem from this brief summary of the evidence:
 
 
 61
 (1) In September, 1973, Bostic operated a filling station for Texas Oil Company (Texaco). The filling station was located on the south side of U. S. Route 60, in White Sulphur Springs, West Virginia. Dr. Bowie owned the lot immediately to the east of Bostic's filling station and had leased the lot to Sun Oil Company (Sunoco) since 1968. The Bowie/Sunoco lot, in turn, was bordered on the east by a lot belonging to Amoco. The Bowie /Sunoco lot therefore separated the properties belonging to Texaco and Amoco.
 
 
 62
 (2) At some time prior to September, 1973, a certain Pharoah, self described as a business development representative for Amoco, placed a "for sale" sign either on the lot owned by Amoco or on the Bowie/Sunoco lot. According to Pharoah and some witnesses, the sign was on the Amoco lot; but according to Bostic and other witnesses, it was on the Sunoco lot. The sign contained the telephone number and identity of the person to call. Plaintiff called Pharoah at the designated number and discussed the purchase of the lot.
 
 
 63
 (3) Pharoah thought he was talking about the lot that Amoco owned, while Bostic thought they were discussing the lot adjacent to the Texaco property the Bowie/Sunoco lot. Pharoah furnished plaintiff with a topographical map of the Amoco lot, accompanied by a letter which referred to the lot as being "next to the Texaco station." However, the map, or plat, correctly showed the exact size and location of the Amoco lot bordered on the west by the Bowie/Sunoco lot, with a reference to where the Bowie lease to Sunoco was recorded, and on the east by property belonging to Greenbrier Development Corporation.
 
 
 64
 (4) Bostic required a loan to consummate the purchase and an attorney to search title and draft the necessary documents. He followed the recommendation of his bank as to whom to employ and Bostic turned over the map to that lawyer with instructions to prepare a purchase option.
 
 
 65
 (5) The Option Agreement was signed by Bostic and Amoco on September 18, 1973. The Agreement identified the property as "0.50 acre, more or less, adjoining the property owned on the West by Texas Oil Company and on the East by Greenbrier Commercial Developments, Corp.," but it also contained this statement: "reference here being made to the records in the office of the Clerk of the County Court of Greenbrier County, West Virginia for a more particular description of said property." The land records clearly identify the Amoco lot as being bordered on the west by the Bowie/Sunoco lot, not by land owned by Texaco.
 
 
 66
 (6) By letter to Amoco dated November 27, 1973, prepared by his lawyer, Bostic exercised the option. The letter no longer referred to the location of the lot as being next to or adjoining any property, but specifically referred to "the same property conveyed unto The American Oil Company, a corporation, predecessor in title to the Amoco Oil Company, a corporation, by Roy D. Bowie and Lois D. Bowie, his wife, by deed dated January 27, 1970 of record in the office of the Clerk of the County Court of Greenbrier County, West Virginia in Deed Book 255, at page 277." As previously stated, the land records clearly show that the Amoco lot was bordered on the west by the Bowie/Sunoco lot and not by any property owned by Texaco.
 
 
 67
 (7) The lawyer continued to represent Bostic throughout the purchase of the property, conducted a title search, and prepared the documents necessary to complete Bostic's loan at the Greenbrier Valley Bank, including a deed and two deeds of trust. The final deed from Amoco to Bostic was dated January 21, 1974. It correctly described the Amoco property, both by metes and bounds and by source of title, and specifically described its location as being east of the Bowie/Sunoco property and running with U.S. Highway Route 60, S 88o 33' E 180.66 feet. Thus, the deed described a lot in the opposite direction from the Texaco lot, since the Texaco lot was on the western side of the Bowie/Sunoco property. The description is accurately taken from the map previously furnished by Amoco, and also reflects the county land records.
 
 
 68
 (8) At the time of the closing of the transaction, a deed of trust was executed by plaintiff and his wife, dated January 28, 1974. A second deed of trust was executed on May 20, 1974. Both deeds of trust contained descriptions of the property, identical to that in the deed. The deed and the first deed of trust were recorded on February 8, 1974.
 
 
 69
 (9) Bostic testified that he read both deeds of trust before executing them, that he had the option drawn up by his attorney, that his attorney told him "he could obtain that (description of the property) from the Greenbrier County Courthouse," that he authorized the attorney "to do everything necessary to represent (him) in this purchase," and that "he (the attorney) continued to represent (him) throughout the transaction."
 
 
 70
 (10) Bostic also said that he noticed on the property map that the Amoco lot was bounded by the Greenbrier property and by the Bowie property, but that it caused him no concern. He also acknowledged that he did not read the deed at the time it was given to him. The attorney furnished the bank with a certificate of title dated January 28, 1974, and was paid by Bostic for his services.
 
 II.
 
 71
 From this evidence, it seems clear to me that Amoco supplied correct information to Bostic and to his attorney concerning the description and location of the lot, albeit Amoco did write a covering letter incorrectly characterizing the location of the lot and, if Bostic's testimony is accepted, Amoco did place a "for sale" sign on the wrong lot. It is equally clear that while Bostic and his attorney partially availed themselves of the correct data which was supplied to them, they completely failed to realize or grasp its significance. It is noteworthy that Bostic's attorney used the correct data in preparing the letter exercising the option. He also used the correct data in preparing the deed and two deeds of trust. More significantly, Bostic's attorney purportedly searched the title, and it is impossible for me to conclude that, since the Bowie lease to Sunoco was recorded, a title searcher of reasonable competence would have failed to discover that the property being sold was not that immediately adjacent to that owned by Texaco and leased by Bostic. This is made all the more apparent when one considers that (a) Amoco's plat of the property gave no reference to the Texaco property that Bostic was occupying, and (b) the subject property was described as adjoining the Sunoco and the Greenbrier properties.
 
 III.
 
 72
 The testimony reveals that Bostic read the map and noted that the Amoco property was bounded by the Bowie/Sunoco lot and a lot belonging to the Greenbrier Development Corporation. Even if his knowledge is insufficient to establish a case of mutual mistake, because he is a layman and cannot be held to a full grasp of plats and property descriptions, the knowledge of his attorney does establish such a case. The record establishes that the attorney examined the map as well, and presumably looked at the county land records during the course of his title search. Both the map and the land records put him on notice as to the land's true location.
 
 
 73
 The majority rejects the attorney's knowledge on the ground that his knowledge was that of the bank and not of Bostic. I find this totally unconvincing. It is true that the attorney was one suggested by the bank when, in a discussion about financing the proposed purchase, Bostic stated that he had not yet employed a lawyer. Nonetheless, the fact is that Bostic accepted the bank's recommendation, employed the lawyer, authorized the lawyer to do everything to represent him in the transaction, accepted the lawyer's services throughout the transaction, and paid the lawyer a fee. To suggest that what the lawyer knew or should have known is not imputed to Bostic under settled rules of agency is to ignore the record.
 
 
 74
 Implicit in what I have previously stated is my view that a competent title searcher will investigate not only that there is good title to the property about to be conveyed, but also that the property about to be conveyed is the property intended to be conveyed. Of necessity, that investigation requires a consideration both of the description of the property and its location. Since Bostic's attorney who, incidentally, was not called as a witness in this case was furnished with the papers of the parties, including Pharoah's letter describing the property as "the land next to the Texaco station" and Bostic's appraiser's report describing the property as "the lot joining Texaco Station on Rt. 60," I see no excuse for the attorney's failure to conduct an examination, broader in scope than that contemplated by the majority, to determine if, in fact, the property about to be conveyed was immediately adjacent to the Texaco property.
 
 IV.
 
 75
 As a result of mistakes made by himself and by his attorney, Bostic built upon the lot leased by Sunoco. The district court acknowledged the case to be one of mutual mistake, and required Bostic to remove the buildings within ninety days of judgment or of a decision by this court, if an appeal was taken. The district court also gave Sunoco the right, in certain circumstances, to seek an order requiring Bostic to remove the buildings sooner. Sunoco was given no other relief. Specifically, the district court declined to award Sunoco any recovery for the rentals Sunoco was required to pay during the period of Bostic's continuing trespass.
 
 
 76
 I think that such an award should have been made in favor of Sunoco and against Bostic in the amount of the rent that Sunoco was bound to pay from the time that Bostic built upon its property until such time as the trespass is abated. Malamphy v. Potomac Edison Co., 140 W.Va. 269, 83 S.E.2d 755, 761 (1954); Lyons v. Fairmont Real Estate Co., 71 W.Va. 754, 77 S.E. 525 (1913).
 
 
 
 *
 Our vacation of the orders of the District Court on the third-party complaints, counterclaims and cross-claims is not intended to rule out the use of the principles of Somerville v. Jacobs, 153 W.Va. 613, 170 S.E.2d 805 (1969), in the event that the Court on the remand may conclude that the decision is useful